No. 14,320.

ISADORE, SAMUEL AND BARNEY J. SUGAR VS. CITY OF MONROE ET AL.

SYLLABUS.

1. Citizens who have voted to tax themselves for a specific work of public improvement, the value of which is fixed at $20,000, have a standing in court to complain that the property acquired is not being used for the purpose contemplated, and this court, in such a case, has jurisdiction of the appeal.

2. Where a vote has been taken upon a proposition to impose a tax to build a school house, and has been favorably acted on, and a building has been constructed with the proceeds of bonds predicated upon such tax, it would be a breach of faith to allow such building to be converted into a theatre, or to be used for the purpose of giving theatrical performances, as a business, whether in combination with its use for school purposes or otherwise. It is, however, within the discretion of the municipal authorities having control of the property to make such casual and incidental use of it as may not be inconsistent with, or prejudicial to, the main purpose for which it was acquired; and changed conditions, in the future, may justify its use for some other purpose.

APPEAL from the Sixth Judicial District, Parish of Ouachita— Hall, J.

*Hudson, Potts, & Bernstein (E. Tyler Lamkin, of Counsel), for Plaintiffs, Appellants.*

*Harry H. Russell,* City Attorney, and *Stubbs & Russell,* for the City of Monroe, Defendant, Appellee.

*William Francis Millsaps,* for Stewart & Co., Defendants, Appellees.

The opinion of the court was delivered by

MONROE, J. The plaintiffs, as citizens and taxpayers, and as owners and licensees of an opera house, in the City of Monroe, bring this suit to restrain the corporate authorities and "Tom Stewart & Co." from using as a theatre a school building belonging to the corporation. The facts disclosed by the evidence are: that, in October, 1898, the Mayor and Council submitted to the qualified taxpayers of Monroe a proposition to raise, by means of an issue of bonds, predicated upon a five-mill tax, the sum of $155,000, for the construction of certain specified public improvements, including a school building, to which $20,000 of said amount was to be appropriated; and the proposition was favorably acted upon at an election called for its consideration. To the $20,000 thus raised, the city added nearly $50,000, drawn from other public revenues, and the aggregate amount was expended in the construction and equipment of a fine building intended and now used for the purposes of a high school, and which, among other advantages, is provided with an auditorium capable of accommodating over a thousand persons. Whether those under whose directions this building was designed originally contemplated making use of the auditorium as a public theatre does not appear, but it is quite certain that no intimation of such a purpose was conveyed to the taxpayers to whom the proposition mentioned was submitted. Since the completion of the building, the city authorities have undertaken, under cover of a pretended lease to the janitor, to use the auditorium as a theatre in which the giving of theatrical, operatic, minstrel, and other performances is carried on as a business, and it is this action of which plaintiffs complain, both as tax payers and as proprietors of a theatre which they pay state and city licenses for the privilege of conducting. The so-called lease is a flimsy contrivance which deserves but little notice. The firm of Tom Stewart & Co. had no existence when it was signed, and, we think, has no existence now. Tom Stewart had been employed by the plaintiffs as

"property man," at their theatre, and was paid by them $2.50 for his services during each performance. He was subsequently employed by the City, or the School Board, as janitor of the new high school building, and his wages were fixed at $45 per month, and, either at that time or later, under the name of Tom Stewart & Co., was assigned the role of lessee of the auditorium. The entire management of the auditorium, for theatrical purposes, has, however, been in the hands of a gentleman who is a member, and chairman, of the finance committee of the city council, mayor *pro tem.* of the city, and member, and chairman, of the entertainment committee of the school board, and who also figures, on the letter-heads of Tom Stewart & Co., as "manager." It is he who makes all the contracts with the minstrel, vaudeville, and other troupes that are engaged to give entertainments, and it is by his direction that the expense of operating the auditorium as a theatre is paid, by the checks of the city treasurer, drawn against an account kept in the name of that officer with the fiscal agent of the city. Tom Stewart conducts none of the correspondence with the theatrical agent, through whom the troupes are engaged, makes no contracts for exhibitions, keeps no accounts, knows nothing of the business except what he is told, and, in addition to his wages as janitor, receives $3.00, for each performance, for his services as property man. The state license for the theatre so conducted is paid, as the other expenses are paid, and no city license is exacted. It is said that these payments have been made in the way of advances to Tom Stewart & Co., and that they have not been made from the funds of the city, but from the proceeds of the entertainments given at the auditorium, which are intended, after paying expenses, to be used for the establishment of a library. Tom Stewart is, however, shown to be without means, or financial standing, so that, making advances to him is merely putting money into the business, and, as the money advanced is derived from the use of a building owned by the city and is paid out on the checks of the city treasurer, the distinction suggested, between the city funds and the library fund is of no practical significance.

It is also said that the auditorium is used as a theatre only when not in use for school purposes; that the one use is not inconsistent with the other, and that it is competent for, and within the discretion of, the city authorities thus to administer the city property entrusted to their charge. It appears that the building in question is a large three-story

brick edifice, and that the auditorium occupies one side, extending through from the first to the third floor and separated from the class rooms and other apartments used for school purposes, on the first and second floors, by the main corridor, the entire third floor being used for the purposes last mentioned. After the institution of this suit, an arrangement was made by which those connected with the theatre are enabled to obtain access to the stage by means of an entrance upon that side of the building, and a screen has been erected in the corridor, so that patrons or others who are expected to enter the theatre through the main entrance are masked from those occupying rooms on the other side. It also appears that there is a heavy brick wall separating the auditorium from the corridor and that, when the doors leading through are closed, sounds in the one place are not much heard in the other. The fact most relied on, however, is, that the building is used as a theatre only at night, or upon Saturdays, or other holidays, when not in use for school purposes; and some testimony was taken, to which we will refer hereafter, with a view to determining whether such use is inconsistent with, or prejudicial to, that for which the building was constructed. There is also testimony tending to show that the cost of insurance is increased by reason of the use of the building for theatrical purposes.

## On the Motion to Dismiss.

A motion is made to dismiss the appeal on the ground that the plaintiffs have disclosed no such pecuniary interest as to vest this court with jurisdiction.

Upon the facts disclosed, we are confronted with the propositions:

1. That the city of Monroe is engaged in the business of conducting a theatre.

2. That, in so doing, it pays no license to itself, whilst it exacts a license from the plaintiffs and from all other persons engaged in the same business.

3. That it is using as a theatre a public building, worth nearly $70,000, especially dedicated, by those at whose expense, in part, it was erected, to school purposes.

Conceding, *arguendo*, that upon the first two propositions, considered apart from the other, the plaintiffs have not established a pecu-

niary interest sufficient under our law to give this court jurisdiction, nevertheless, upon the third, which involves the question, whether the municipal authorities are diverting or making an illegal use of the building in question, which is public property, any taxpayer has the right to come into court, and, *quoad* the amount, the jurisdiction is determined by the value of the property or of the interest therein represented by the money specially voted for a school building, the case not being materially different from what it would have been if the mayor and council had originally proposed to devote the $20,000 raised for that purpose to the construction of a theatre and had been enjoined from so doing. Handy *et als.* vs. New Orleans *et als.*, 39th Ann. 107; Conery *et als.* vs. Waterworks Co. *et als., ib.* 770; State *ex rel.* Orr vs. City *et als.*, 50 Ann. 880; City Item Co-operative Printing Co. vs. City, 51 Ann. 713; Dillon on Mun. Corps., Secs. 914-937. The motion to dismiss the appeal is therefore denied.

## On the Merits.

The charter of the city of Monroe was not offered in evidence, but it is not pretended that it confers, or could confer, authority upon that municipality to engage in the business of conducting a theatre, and, apart from the fact that, as a municipal corporation, it has no legal capacity to engage in such business, it is, manifestly, unjust for it to do so, in competition with a taxpayer from whom it exacts a license which it does not, itself, pay. But, passing from these questions, we find that this business, objectionable for the reasons stated, is carried on in a building constructed, in part, with money especially dedicated to the erection of a school house. It may very well be questioned whether the citizens who voted to tax themselves for the latter purpose would have consented to do so for the purpose of establishing a combination school house and theatre. There are many excellent people who disapprove of theatres entirely, and there are others who disapprove of a combination which brings little boys and girls attending school in such daily juxtaposition with flaring posters and theatrical movement as must result from having the school and the theatre in the same building. And it would be a breach of faith to permit the money voted by either of these classes of citizens for the one purpose to be used for the other.

The proposition upon which the learned counsel for the defendants rely may be fairly stated in the following excerpt from the brief filed by them, which includes an expression from the Supreme Court of Massachusetts in what is assumed to be an analogous case, to-wit:

"In the case of Warden vs. New Bedford, 41 Am. Dec. 185, it was contended that a city or town has no power to let public buildings for private uses. The Supreme Court of Massachusetts said: ' The ground is untenable. The city could not erect buildings for business or speculative purposes, but, having a city hall, built in good faith and used for municipal purposes, it has the right to allow it to be used, incidentally, for other purposes, either gratuitously, or for a compensation. Such a use is within its legal authority, and is common in most of our cities and towns.' "

We find no reason to dissent from the views thus expressed, and have little doubt that they were appropriate to the case decided. It does not appear, however, that the building there in question had been erected wholly or in part, with the proceeds of a tax levied under a provision of the constitution of the state which specifically controlled its destination. Nor does it appear that the "incidental" use of the property which was sanctioned was inconsistent with, or prejudicial to, the purpose to subserve which the building had been constructed, whereas, in the case before us, $20,000 of the money used was specifically voted for a school building, and it can hardly be said that the use which the defendants propose to make of the building, as constructed, is "incidental," since the idea is to keep it filled with theatrical attractions as long as the season lasts, merely regulating the performances so as not, actually, to prevent the school exercises from being conducted, there being, also, strong evidence in the record to the effect that this method of administering the building is highly detrimental to the purpose for which it was erected. Upon this latter point, we quote the language of the distinguished president of the State Normal School, at Natchitoches, examined as a witness in this case, to-wit:

"I have had twenty-five years' experience in teaching. * * * The State Normal School of Louisiana has an assembly hall, or auditorium, in the same building as the class rooms. To lease this assembly hall to any private person, or corporation, for the purpose of a public theatre, or opera house, would have a disastrous effect upon the conduct, discipline and influence of the institution. The reasons for

above statement  *  *  *  are as follows: (a) The room is needed at all times for school purposes; is used for morning exercises, general announcements, school lectures, calisthenic drill, and chorus practice, and is a study hall for all students who are not in recitation. Outside of school hours, it is used for piano and school practice, class meetings, Y. M. C. A. meetings, club meetings, gymnastic drill, receptions and social gatherings of students and teachers, and union meetings of the literary societies. To lease this room to outside parties would deprive the school of all these uses for it. (b) The presence in the building of persons who are not familiar with the requirements of the school, and not subject to its control, would interfere with discipline and interrupt class work. (c) Some of the persons connected with traveling theatre companies are objectionable in character and conduct. (d) Some of the persons who would attend a public theatre here are of disorderly habits, defacing furniture, marring the walls, soiling the floors, and meddling with, or injuring, apparatus or other movable property. (e) A school building stands for the sole purpose of training young people, intellectually, morally and socially; it should be the student's temple of correct taste, right conduct and pure ethics. Whatever is morbid or unwholesome should be kept out of the school house. To use part of the school building for a public theatre is objectionable for the same reason that it would be objectionable to use part of it for a hospital, or a saloon, or a jail; that is to say, such a use degrades the building by associating school work with the morbid aspects of life.  *  *  *  I have seen the Monroe high school building. I have never been inside the building since it was completed and occupied. I do not know all the conditions that exist in the building, and I cannot, therefore, give a positive statement of the effect in this instance. But I do not hesitate to say that the leasing of any part of any school building for use as a theatre would have a harmful effect on the school conducted in the building.  *  *  *  I am a great admirer of the theatre, and attend every theatre that I have a chance to attend, when either a play of merit or an actor of ability is presented."

The opinions of the principal of the Ouachita High School and of a prominent citizen of Monroe, who was for some years a teacher, are to the same effect. Upon the other hand, the principal of the Monroe High School gives a qualified approval of the use of the building for theatrical purposes. Thus, being asked whether he was willing to

swear that it had no harmful effect upon the city school, he answered:
"I can safely say that it has not, up to date, had any harmful effect.
I haven't noticed any.  I can't say what will take place in the future,
but I haven't noticed any."

And the mayor and mayor *pro tem.* seem to be of the same opinion.
Considering the case in the light of this testimony, the least that we
can say is, that, whereas we know that the qualified voters of the city
of Monroe voted to tax themselves for the purpose of erecting a school
house, we have no assurance that they would have so voted if they had
been informed that the building to be erected would be used as a
theatre, as well, and that we should not consider that they were fairly
treated if the property for which they are still paying, year by year,
should be permitted to be used for a purpose not intended by them
and of which, in all probability, some, if not a majority, of them would
disapprove.  In expressing this conclusion, we do not wish to be under-
stood as going to the extreme of holding that the city authorities may
not make such casual and incidental use of the building in question,
not inconsistent with, or prejudicial to, the main purpose for which
it was erected, as they may deem advisable, nor as holding that
changed conditions in the future may not justify them in devoting it
to some other purpose.

The question here presented is, whether they have the legal right, at
this time, to make use of it, or any part of it, for the purpose of main-
taining a theatre therein, or of giving theatrical performances, as a
business, and this question we decide in the negative.

It is, therefore, ordered, adjudged and decreed, that the judgment
appealed from be annulled, avoided and reversed, and that there now
be judgment in favor of the plaintiffs and against the defendants, the
City of Monroe and Tom Stewart & Co., decreeing fictitious and sim-
ulated the pretended contract of lease between said parties and per-
petually enjoining and restraining them, or either of them, from fur-
ther operating, or pretending to operate, thereunder.  It is further
ordered and adjudged that said defendants pay the costs in both courts,

BLANCHARD, J., takes no part.

Rehearing refused.