## DARLING *v.* HAFF.

1. VENDOR AND PURCHASER.

> Where the purchaser of land under contract learned on the day following the execution of the agreement that the vendor's title was encumbered by a deed given as security for a loan to the vendor, and thereafter paid to the vendor a part of the consideration, making no demand for a return of the first payment, he was in no position to maintain, in defense of an action for the purchase price

remaining unpaid, that plaintiff, who was then in position to give a clear title, had defrauded or deceived him as to the state of his title.

2. TRIAL — CROSS-EXAMINATION — WITNESSES — COMPROMISE AND SETTLEMENT.

In an action for a balance claimed by plaintiff to be due upon a land contract and other items, defendant claiming that all matters had been settled and compromised by paying the balance agreed upon, it was error to restrict the cross-examination of plaintiff as to time of payment, the time of surrendering possession, and like questions relating to the issues in dispute.

3. SAME—CHARGE.

It was also error, having a tendency to belittle the defense, to instruct the jury, after the case had once been submitted, and they had returned for additional information, that if they found for plaintiff they should deduct from the verdict 55 cents which had been paid out by defendant who, however, made no claim for this amount and had introduced no testimony in support of the deduction.

Error to Shiawassee; Miner, J. Submitted January 10, 1913. (Docket No. 50.) Decided May 28, 1913.

Assumpsit by Fred Darling and another against Henry P. Haff for a balance due. Judgment for plaintiffs. Defendant brings error. Reversed.

*A. L. Chandler* and *George E. Pardee,* for appellant.

*Kilpatrick & Pierpont,* for appellees.

STEERE, C. J. This suit was brought in the circuit court of Shiawassee county to recover a balance alleged to be due and unpaid on the purchase price of 80 acres of land located in the township of Fairfield, Shiawassee county, sold by plaintiffs to defendant, in August, 1910; also, for a board bill and the use of a horse and buggy. The case was tried before a jury, and plaintiff recovered a verdict of $370.15.

On the 16th of August, 1910, plaintiff Fred Darling entered into a written contract with defendant, Haff, agreeing to sell and convey his farm of 80 acres to the latter for the sum of $5,750, $200 to be paid down, and the balance of $5,550 on or before November 1, 1910. Darling agreed to furnish a clear and good title, an abstract showing the same, pay all taxes against the property, and give possession on October 15, 1910. The $200 payment was to be refunded in case satisfactory title was not furnished. Darling and his wife had resided upon said farm for nearly 25 years. He claimed ownership by inheritance and conveyance from joint heirs.

At the time these negotiations were entered into, the title to said property rested in a man by the name of Crampton, who had loaned $2,940 to Darling, and who instead of taking a mortgage as security had taken from Darling a deed of the property, giving back a contract to reconvey when the indebtedness was paid; and, not being entirely satisfied with that security, he also exacted, as additional security for the same loan, a chattel mortgage on certain personal property of Darling's. Darling claims that he fully advised Haff of this indebtedness and condition of the title, while they were negotiating the deal, and that on August 16th, when the contract was entered into, they together visited Crampton, informed him of their contract, and arranged with him to accept payment at any time, and reconvey the title on receipt of payment of his loan. Haff denies this, and claims he did not learn of the loan and condition of the title until later. His counsel dwell upon this as a matter of serious import, evidencing dishonesty and a breach of contract on Darling's part. Whether Haff learned of this before or after he entered into the contract is of no material significance, as he admits having learned of it the next day; and instead of objecting, or demanding a refund of the $200 he had paid, he paid

Crampton $100 on the 17th of August and obtained from him a written agreement to surrender his security and convey the property as desired on payment of his loan on or before November 1, 1910; and on September 5th he paid the loan in full, receiving from Crampton and wife a quitclaim deed of the property and an assignment of the chattel mortgage.

Crampton had an abstract of title of the property which Darling testified was treated as the one to be furnished by him. Haff, though not in full possession, began certain improvements on the property before October 15th, at which time possession was to be given him. Darling, during that time, boarded some of his men and furnished them a horse and buggy a few times. Owing to the work of gathering certain beans and sowing certain wheat provided for in their contract, as well as the lateness of the season, full possession was not surrendered, apparently by an understanding between the parties, until about November 1st. Prior to October 15th Haff had employed counsel to investigate the title and had, as he claims, discovered it was defective in the particular that the estate of Darling's father had not been probated. In anticipation of surrendering the farm, Darling had advertised his personal property to be sold at auction. Haff claimed a lien on certain of this property by reason of the chattel mortgage Crampton had assigned to him, and, on October 17th, accompanied by his son and an attorney, he visited plaintiff at the farm. Objection was made to Darling selling some of his property at auction before all matters were adjusted between them. Complaint was made as to the condition of the title to the farm, and it was urged that Darling should pay certain expenses incurred or to be incurred by Haff in that connection, and a settlement of their affairs was proposed. Accounts were produced and negotiations had between the parties, in which their business relations and differences were fully can-

vassed; they discussed expenses incurred in investigating the title and probable cost of perfecting it, plaintiff claiming his father's estate had been probated and defendant that it had not. They also canvassed a claim of plaintiff for certain ditching he had done on the farm, taxes unpaid, and the amount Haff had paid Crampton in liquidation of his loan, about the amount of which there was some controversy.

It clearly appears from the evidence of all the witnesses, including plaintiff and defendant themselves, that the result of these negotiations was some kind of adjustment, understanding, and agreement, reached between the parties as to all matters in difference, except possibly the board bill and use of plaintiff's horse and buggy, ending in Darling and wife executing a deed of the property and Haff agreeing to leave at the bank in Elsie, for Darling, $2,148 to be paid him, less $48 agreed upon as the taxes to be settled by him.

It being beyond dispute that there was such an adjustment, agreement, and settlement, the only questions open to litigation were the terms of such settlement; therefore most of defendant's many assignments of error, being directed to matters settled by agreement of the parties, are foreclosed and become immaterial, requiring no discussion here.

It is the claim of defendant that a full and final settlement was reached, followed by full payment of the amount agreed upon, being the sum of $2,148, less the $48 reserved for taxes.

Plaintiff claims he did not receive payment in full, but that certain items not yet definitely ascertained were reserved and a sum was kept back to cover them, the balance when ascertained to be paid him, and that he is yet entitled, under that agreement, to some $370. He testified that there was an agreement between Crampton, Haff, and himself that Haff should pay all

that was coming to Mr. Crampton and that was to be taken out of the price of the farm.

His testimony as to what was not fully adjusted varies somewhat in different portions of his evidence. He testifies in his direct examination as to the transaction on October 17th as follows:

"They claimed I could not give title because there was a flaw in the title; I would have to clear that flaw in the title before I could get the balance of my money; they claimed it had not been probated; the Oscar Darling estate had not been probated. * * * They claimed it would cost up to $300 to clear up the title, or it would have to go through probate court. I agreed to clear up the title, which I did; I was to clear it up.

"Q. How much, what was left, what was the balance left until it was cleared up?

"A. The balance was left between what he paid Crampton and what he paid me then. It was $300 and better the way I figured it. At that time it didn't figure out so much because he claimed he paid Mr. Crampton more than that."

On cross-examination plaintiff testified in part as follows:

"Q. What items went in to make up the amounts of money and the payment which was made to you at the time you delivered over the deed?

"A. Well, there was the Crampton debt and the $200, an amount when we settled up with Mr. Chandler that day; Mr. Chandler attended to that; there was that item went in. That item was consented to, but there was some items there that we didn't consent to. We didn't consent to his bringing Mr. Kelly down there. He wanted we should be to the expense of that. I don't remember whether there was any other item Haff presented. * * *

"Q. After you talked these matters over, did they have a set of figures there as to what Haff claimed and what you claimed?

"A. Yes, we had a set of figures.

"Q. And after you had talked them over and dis-

cussed them, did you come to some agreement as to how much he should pay you and receive the deed?

"*A.* We gave the deed, we signed the deed that day. *  *  *  If I remember right, the deed was to be left there to the Elsie bank.  *  *  *

"*Q.* Did you get the money?

"*A.* Yes, I got the money afterwards.

"*Q.* You caused your deed to be delivered on the arrangement you and Mr. Haff made on that day?

"*A.* Yes, sir.  *  *  *

"*Q.* Besides your work and your board bill—that is, I mean your horse and board bill—and this amount which was to be paid after you probated the property or got the title satisfactory to him, besides those three items, was there anything else that was not settled?

"*A.* No, there wasn't anything else.  *  *  *

"*Q.* Your claim here now is for the balance which you claim was found or to be found on that day on that settlement and your other claim here?

"*A.* Yes, that is what I am suing for.  *  *  *

"*Q.* And at that time, this, as you state now, was the arrangement, that if the probate and expenses were $150 or $200 that you would stand them, other-wise that he would pay the balance that was figured up there?

"*A.* Yes, sir.

"*Q.* Now, was that the arrangement that was made that day?

"*A.* That is the arrangement.

"*Q.* Was that, do you claim, the final arrangement?

"*A.* That was the final arrangement."

Plaintiff also testified that he agreed to allow a bill of $10 for services of Mr. Chandler in looking after the Crampton transactions on the 5th of September. His testimony, taken as a whole, apparently narrows down all possible issues in the case to the item of $100 paid by Haff to Crampton as an alleged bonus for settling up the loan before it was due, certain expenses claimed by defendant in connection with looking after and straightening out the title to the property, and the board bill and horse hire.

In view of the nature of plaintiff's testimony in re-

gard to these matters, in direct contradiction of the testimony of defendant and his witnesses that there was a full and complete settlement and payment, counsel for defendant were entitled to a degree of latitude in cross-examining plaintiff. We are inclined to the view that the record, taken as a whole, discloses that this opportunity was in some particulars prejudicially abridged. Among other things, the following occurred in the examination of plaintiff by defendant's counsel:

"*Q.* You paid that at the time when the deed was given to Haff, didn't you?

"*A.* Why—

"*Q.* You can answer yes or no, if you will.

"*A.* It was figured in, yes, it was figured on that day.

"*Mr. Pierpont:* We object now. The evidence so far shows he didn't pay it himself personally.

"*The Court:* There is no question about that. He has told it several times. I will sustain that objection. You try and mix this up.  *   *   *

"*Q.* You were to give full possession on the 15th of October, 1910, were you not? Was that your understanding of it?

"*Mr. Pierpont:* We object to that; the contract shows for itself.

"*The Court:* Objection sustained.  *   *   *

"*Q.* Did you give possession of this property on the 15th of October?

"*The Court:* That will be excluded. He stated he gave possession about the 1st of November. The contract you have before you states the time. We are taking a lot of time and not getting many facts.  *   *   *

"*Q.* Witness, if there was any agreement that Mr. Haff was to pay you anything in addition at the time you gave him over this deed, why did you not ask him for some note or memorandum showing what the amount was that he was to pay you?

"*Mr. Pierpont:* We object to it; the contract states the amount to be paid in full.

"*The Court:* Objection sustained.  *   *   *

"*Q.* And as to the amount of the board bill and this

horse, that part had transpired, or most of it, before this day of settlement?

"*The Court:* You need not answer that. He has answered it two or three times. Proceed. See if we can't get along."

We fail to discover that the record bears out this statement.

After the jury had retired to consider the case, they returned to the courtroom and asked for the figures showing the amount of plaintiff's claim. Certain testimony was read by the stenographer. In answer to an inquiry from the foreman, the court stated that plaintiff claimed in his declaration a balance of $372.50, and then said:

"I wish to add, there is a little item I overlooked. If you should find for the plaintiff, I think you should allow the defendant what the defendant paid out additional for the abstract, which is 55 cents."

We find no foundation for this item in the record, and, in the connection it was stated to the jury, it can, with some reason, be urged as tending to belittle the defense.

In this case it is undisputed that there was a settlement of the main differences between the parties; that a deed to the property was given and accepted and a payment of most, or all, of the balance of the purchase price made and accepted. There is no occasion to confuse the real issue by trying the once open questions which the parties have settled.

Defendant claims that everything involved in the case was finally agreed upon and settled and payment made in full. Plaintiff claims a certain portion of the purchase price was, by agreement, withheld to cover the contingency of certain distinct items, which he testifies to specifically, and that with them now disposed of there is a balance yet his due. His claim is almost entirely contingent on his own testimony, and while it may be urged that defendant's counsel was

unnecessarily, and perhaps annoyingly, prolix in the examination of witnesses on issues which became immaterial by reason of the unequivocal adjustment of them by the parties between themselves on October 17th, we think that in plaintiff's cross-examination as to the settlement, and items he claims were reserved for a further and final settlement, and which present the paramount issue, some latitude should be given, without any restrictions or criticism, which might be taken by the jury as an intimation of the view of the court on the merits of the defense.

We are constrained to hold that the judgment must be reversed, and a new trial granted.

MOORE, McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.