[Civ. No. 1882.   Third Appellate District.—October 24, 1918.]

B. F. McCLURE et al., Appellants, v. BOARD OF EDUCATION OF CITY OF VISALIA, etc., Respondent.

Schools and School Districts—Use of Schoolhouses for Social Dances—Civic Center Act.—A social dance is a "recreational activity," for which a board of education may permit the use of a schoolhouse in accordance with the provisions of the Civic Center Act (Stats. 1913, p. 853), and subdivision fourth of section 1617 of the Political Code.

APPEAL from a judgment of the Superior Court of Tulare County.   W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

E. I. Feemster, for Appellant.

Power & McFadzean, Frank Lamberson, and P. D. Nowell, for Respondent.

BURNETT, J.—The vital point in the case is whether the board of education of the city of Visalia is authorized to per-

mit a social dance in the high school building. The question here is, manifestly, one of power and not of policy. If we find that under any reasonable interpretation of the law such right exists, then we cannot interfere with the contemplated action of the board. It is the claim of respondent that the authority to permit such use has been conferred under proper restriction by the provisions of what is known as the Civic Center Act (Stats. 1913, p. 853), and subdivision 4 of section 1617 of the Political Code.

Said Civic Center Act provides: "There is hereby established a civic center at each and every public schoolhouse within the state of California, where the citizens of the respective public school districts . . . may engage in supervised recreational activities." Dancing would seem to be a form of "recreational activity" within the recognized meaning of that phrase. This court would hesitate to proclaim itself an authority on the subject, but it is bound to accord due weight to the opinions of those who have given careful consideration to such diversion. Our attention is called to the fact that "recreational" means, "of, pertaining to or conducive to recreation." (Century Dictionary.) "Recreation" means, "Refreshment of strength and spirits, after toil; relief from toil or pain, diversion, amusement in sorrow or distress." (34 Cyc. 764, note 14; *Corey* v. *Bath,* 35 N. H. 530.)

Upon the word "activity" the dictionary sheds the following light: "The state of action, doing; an exercise of energy or force; an active movement or operation; a physical or gymnastic exercise, an agile performance." We are inclined to believe with respondent that dancing is an "amusement." If it were not, we very much doubt that it would be so popular. That it requires an *active movement* or *operation* and involves *physical* or *gymnastic* exercise, and that it frequently amounts to an *agile* performance, we think no one will dispute who has witnessed a modern terpsichorean festival. Planting itself, therefore, on the definition of the terms used, respondent is not without warrant in asserting that this very diversion is one of the things contemplated by the legislature in its formulated and expressed vision of the public schoolhouse as a "civic center" for the social and educational activities of the community. We consider the foregoing a distinct provision of said act, and we do not regard it as limited or confined by the following clause: "and

where they may meet and discuss, from time to time, as they may desire, any and all subjects and questions which in their judgment, may appertain to the educational, political, economic, artistic and moral interests of the citizens of the respective communities in which they may reside.'' It is not unreasonable to hold that by the use of these co-ordinate clauses the legislature had in view two distinct phases of human activity, one pertaining primarily to physical recreation and development in which children might participate, and the other, to the mental and moral aspect of human life, which would particularly appeal to the more mature mind.

'As to the exercise of the power, it is well to observe that the legislature has provided in the act ''that such use of said public schoolhouse and grounds for said meetings shall in no wise interfere with such use and occupancy of said public schoolhouse and grounds as is now or hereafter may be required for the purposes of said public schools of the state of California.'' We may add that there is no contention that there has been or will be any interference herein with the ordinary purposes of the school. It is to be observed further that said act commits the management, control, and supervision of these special activities to the board of education in the following language of section 3: ''The management, direction and control of said civic center shall be vested in the board of trustees or board of education of the school district. Said board of trustees or board of education shall make all needful rules and regulations for conducting said civic center meetings and for such recreational activities as are provided for in section 1 of this act.''

This act constitutes the last expression of the legislative will on the subject, and it is not a strained construction to hold that thereby respondent was clothed with discretion to permit, under proper supervision, the form of ''recreational activity'' that is involved herein.

Looking further for legislative authority for the action of the board, we find it in an earlier statute constituting section 1617 of the Political Code, which, as far as material, is as follows: ''The powers and duties of trustees of common school districts, and of boards of education in city school districts are as follows: . . . Fourth—Rent, etc., School Property . . . To grant the use of school buildings or grounds for public, literary, scientific, recreational or educational meet-

ings, or for the discussion of matters of general or public interest, upon such terms and conditions as said trustees or boards of education may deem proper; provided, however, that said use shall not be inconsistent with the use of said buildings or grounds for school purposes nor interfere with the regular conduct of school work; and provided, further, that no privilege of using said buildings or grounds shall be granted for a period exceeding one year, such privilege being renewable and revocable in the discretion of said trustees or boards of education."

It is the claim, though, of appellants that this grant of power is circumscribed and limited by subdivision 18 of said section, providing that "boards of trustees may, and upon a petition signed by a majority of the heads of families resident in the district, must call meetings of the qualified electors of the district," etc. "A meeting so called shall be competent to instruct the board of trustees. 1. In regard to the location or change of location of the schoolhouse, or the use of the same for other than school purposes; provided, that in no case shall the schoolhouse be used for purposes which necessitate the removal of any school desks or other school furniture." The complaint alleges that such removal of the furniture was necessary in the present instance in order to facilitate and promote the dance. Thus, it is claimed, has the board clearly transgressed, and will continue to transgress, this statutory limitation upon its authority. But, it seems that the legislature has made a distinction in this respect between the city and country schools. The general authority extends to the "trustees of common school districts" and "boards of education in city school districts." Subdivision 18, however, is confined to "boards of trustees." It is the "board of trustees" that such meetings shall be competent to restrict. Respondent suggests this reason for the distinction: "Common schools are most frequently located in the smaller rural communities, and are often only one or two room buildings without auditorium or assembly place, the seats are often screwed to the floor, and any removal of the desks or furniture would be apt to be done by inexperienced hands and result in damage to the floor; the desks might be piled up or taken out of doors, or hauled to the out-buildings or to the house of some person in the district, thus suffering damage. On the other hand, city schools are more often

housed in larger buildings of many rooms with a ' central place of assembly. Janitors are employed, who devote all of their time to their occupation, and furniture is often arranged for ready removal without damage or inconvenience. The rule of subdivision 18 would be unnecessary in such instances.''

Neither do we find such limitation of the power of the board of education in the Municipal Act providing for cities of the fifth class, to which Visalia belongs. Section 798 (Stats. 1899, p. 99) of said act provides: "The board of education shall have power . . . Sixth—to purchase, receive, lease and hold in fee, in trust for such city, any and all real estate and personal property that may have been acquired, or may hereafter be acquired for the use and benefit of the schools of such city; provided that no real estate shall be bought, sold, or exchanged nor any expenditure incurred for the construction of new schoolhouses, without the approval of the board of trustees; *and provided further,* that the proceeds of any such sale or exchange of real estate shall be exclusively applied to the purchase of other lots for the erection of schoolhouses.'' This constitutes, manifestly, a larger grant of· power to the city board as to the management and control of the school property than is conferred upon the trustees of common school districts. The particular limitation as to the use of the building, to which we have referred, applies to the latter but not to the former.

However, the schoolhouse, whether in the urban or rural district, must, of course, be used for a public purpose, and that purpose must have some relation to the educational or recreational needs of the community. It is manifest, though, that within the limits of said statutory provisions there is room for the exercise of a wise discretion on the part of the board of education.

It is equally plain that the board would have no authority to grant an exclusive privilege to any of the citizens to use said building. Plaintiffs probably had this principle in mind when they alleged that "a private" dance was contemplated by the board. They concede, however, that this is rather a conclusion, and is open to the objection raised by the special demurrer. Hence, we treat the case upon the broad ground of the power of the board to permit this particular form of diversion.

As to the cases cited, they must, naturally, be regarded in the light of the provisions of the statute in the various states wherein said opinions were rendered. It was pointed out in the opinion of the trial judge, Honorable W. B. Wallace, that in the states having no laws permitting the schoolhouses to be used for other than school purposes, the courts have held such other uses to be illegal.

"Thus the following uses have been enjoind: In Connecticut, Sunday-schools and religious meetings; in Kansas, various society meetings whereby the rooms were overcrowded and the furniture injured; in Pennsylvania, religious meetings, lyceums, and private schools; in Louisiana, a theater conducted as a business; in Ohio, private schools; in Wisconsin, regular meetings of the Sons of Temperance.

"Other states have laws permitting the electors to vote on the question of using a public schoolhouse for other than school purposes and courts in these states have sustained the following uses after elections favorable therefor: In Iowa, Indiana, and Illinois, meetings for religious purposes; in Missouri, for a literary society; in Arkansas and Illinois, as a lodge-room for a secret society; in Vermont, for a private school; in Maryland, at a nominal rent as headquarters for a regiment of the national guard."

In *Appeal of Barnes,* 6 R. I. 591, it was held that the trustees of a school district may, subject to the control of the district meeting, lawfully permit the district schoolhouse to be used, out of school hours, for the purpose of private instruction in vocal music of the district scholars and others residing in the district. The decision was grounded upon the principle that such use tended to promote public education and that the trustees were acting within the spirit of their trust.

In *Townsend* v. *Hagan,* 35 Iowa, 194, it was held that "the electors of a school district may legally permit the schoolhouses in the district to be used for the purposes of religious worship and secondary schools." The court was called upon to construe the provision of the statute permitting the electors when legally assembled "to make such disposition of the schoolhouses as they may deem right and proper." The court concluded that such use was within the spirit and intent of said provisions.

The decision in *Lagow* v. *Hill*, 238 Ill. 428, [87 N. E. 369], upholding the action of the board of school directors in permitting certain fraternal organizations to hold meetings in one room of the school building, was based upon the following provision of the school law of that state: "They [the board of directors] shall have the control and supervision of all schoolhouses in their district, and may grant the temporary use of schoolhouses when not occupied by schools, for religious meetings and Sunday-schools, for evening schools and literary societies, and for such other meetings as the directors may deem proper."

In *Spencer* v. *Joint School District*, 15 Kan. 259, [22 Am. Rep. 268], the action was to restrain the use of the school building for other than school purposes. The decision was by Justice Brewer, afterward justice of the United States supreme court, and he treated the subject with his characteristic force and persuasive reasoning. He declared: "We are fully aware of the fact, that all over the state the schoolhouse is, by general consent, or at least without active opposition, used for a variety of purposes other than the holding of public schools. Sabbath-schools of separate religious denominations, church assemblies, sometimes public meetings, social gatherings, etc., are held there. Now, none of these can be strictly considered among the purposes for which a public building can be erected, or taxation employed. . . . The public schoolhouse cannot be used for any private purpose. The argument is a short one. Taxation is invoked to raise funds to erect the building; but taxation is illegitimate to provide for any private purpose. Taxation will not lie to raise funds to build a place for a religious society, a political society, or a social club. What cannot be done directly cannot be done indirectly." The conclusion was undoubtedly sound. But, as before suggested, we are dealing with a public use and with a statute somewhat enlarging the public educational purposes for which a schoolhouse may be used.

We may leave the citations with the case of *Lewis* v. *Bateman*, 26 Utah, 434, [73 Pac. 509]. Therein the court stated: "The only question involved in this case is, have the trustees of a school district the legal right and power to permit a public schoolhouse, which is the property of said district, and which is used for school purposes, to be used for holding

public and private dances—a use which is in no way connected with the school and which would not promote or advance its interests, but, on the contrary, the effect, if any, would necessarily be inimical and detrimental to schools?" It was rightfully held that the private use, which it was thus proposed to make of the public school building, was unauthorized and contrary to public policy and the use for either public or private dances would be in violation of a plain provision of the statute of Utah prohibiting the removal of the furniture from the schoolroom. It is thus apparent that in its facts the Utah case differs from this.

There is some intimation that a moral question is involved herein. Of course, the board of education should not tolerate an indecent or immoral use of the schoolhouse, but it cannot be said that they contemplate anything of the kind. It is clear that there is a difference of opinion among well-informed people as to the moral effect of dancing. As said by the trial judge: "There are many excellent, intelligent and pious people who are opposed to modern social dancing as being fraught with harm to the participants and to the community. To the contrary, there appears to be a much larger number, equally excellent and intelligent, including many pious people, who dance and teach their children to dance. . . . Some people abuse the privilege of dancing by their manner of dancing and sometimes by their mode of dress. Those who are coarse and immodest often express those qualities in the ballroom when dancing, and all public dances should be supervised. On the other hand, people of fine instincts and feelings, and proud of their willingness and ability to do right at all times, will reflect their modesty and fine character on the dancing floor."

Even the most fastidious would certainly distinguish between the joyful and reverential dance of Miriam and the voluptuous and wanton dance of the daughter of Herodias, which led to the beheading of John the Baptist.

We must indulge the presumption herein that respondent contemplates a "recreational" activity free from any immodesty and which may be conducive to the social and educational advancement of the community. We must, also, assume that it is not an exclusive function, but open to all on equal terms. Indeed, the probabilities are that it is designed to afford the various classes of the high school an

opportunity to meet for social intercourse, and to promote the grace of movement and charm of physical development that are supposed to result from a wholesome and properly supervised dance.

At any rate, we think the question was for the school authorities to determine, and such an abuse of discretion has not been shown as to warrant the extraordinary writ of injunction.

In our opinion, the demurrer to the complaint was properly sustained, and the judgment is affirmed.

Chipman, P. J., and Hart, J., concurred.