MERRYMAN v. SCHOOL DISTRICT No. 16, ET AL.
(No. 1698; Nov. 24, 1931; 5 Pac. (2d) 267)

For the appellant there was a brief by *James T. Mc-Guckin,* of Sundance, Wyoming, and *W. K. Somers,* of Moorcroft, Wyoming, and an oral argument by *Mr. Mc-Guckin.*

For the respondent there was a brief by *E. C. Raymond,* of Newcastle, Wyoming, and oral argument by *Maurice L. Cohn,* of Sheridan, Wyoming, for *E. C. Raymond.*

RINER, Justice.

This is a proceeding by direct appeal to review an adverse judgment against John W. Merryman rendered by the District Court of Crook County in an action wherein Merryman was plaintiff and School District No. 16 in the County of Crook and State of Wyoming, and O. J. Biggs, Peter Peterson and Inez C. Noonan, as members of the Board of Trustees of said School District, were defendants.

The relief sought in the District Court was an injunction against the defendants, restraining them from leasing or permitting the use of, either for hire or otherwise, the property of the aforesaid School District, for dances, social entertainments by persons or organizations charging admission fees, or for any other purpose than strictly school or educational purposes. The facts established by the proofs taken in the case before the court without a jury, and upon which the plaintiff requested that the relief desired be granted, are substantially these:

That School District No. 16 in Crook County, Wyoming, is a school district duly organized pursuant to state law, and the individual defendants above named are its board of trustees and officers; that during the years 1929 and 1930, the said district, by means of the issuance of its bonds pursuant to law, borrowed money to the extent of $28,000, and erected a school building additional to that already owned and controlled by it; that, as stated in the notice of the bond election, the bonds aforesaid were issued and the money obtained for "the purpose of constructing and furnishing a new school building upon the school grounds in the town of Moorcroft in said district, and to repair the existing school building thereon and provide the same with necessary and suitable sanitary and other conveniences and equipment;" that the plaintiff Merryman is a resident, taxpayer and voter in the town of Moorcroft, said town being in School District No. 16; that he is the owner of a small dance hall, which he hires for dances, public meetings and social gatherings; that since the erec-

tion of the new school building hereinabove mentioned, he has received no revenue from his hall through hiring the same to local people, although prior to that time his hall was occasionally rented by local organizations; that early in the year 1930, the Board of Trustees of the School District leased the newly erected school building to the Knights of Pythias Lodge for the purpose of holding a dance one evening, charging the lodge the sum of $10 therefor, this amount more than repaying whatever expense for lights, fuel, etc., was thereby incurred by the district; that the dance thus held was an orderly, law-abiding gathering and the building was in no wise injured by it; that so far as dances are concerned, the school building has not affected plaintiff's building at all. Plaintiff testified that one of the members of the board stated to him that they were going to continue to have dances in the building, this statement being made to plaintiff at the time he made protest concerning their action in allowing the fraternal organization aforesaid to have the use of the building—but this board member, himself a witness, denied making any such statement..

It was also established that with the consent of the Board of Trustees of the School District, an organization known as the Parent Teachers Association has, probably once a month, held meetings in the new building, on one occasion putting on a ''carnival'' or show, at which an admission fee was charged any person who desired to attend; that the board has made no charge to said association for light, heat or the use of the building; that the association intends in the future to continue to hold its meetings in the school building as it has in the past, and to sell lunches prepared with school equipment to those who attend the meetings, making thereby enough money to pay for the lunch itself and, perhaps, a very small profit; that the Parent Teachers Association of Moorcroft is an organization composed of the patrons and teachers of the schools and also of people who have no children in school but who are interested

in education; that the object of this association is to see that the school at Moorcroft is properly and carefully conducted; that the entertainment given by the association in no way injured the school building, and the money raised by it was used to purchase a curtain for the stage in the auditorium of the school building.

The proofs further established that basket ball games, participated in both by the students of the Moorcroft school and students from other schools of the state of Wyoming, are held in the auditorium or general assembly room of the school building, which can be and is used by the school children of the school district as a gymnasium; that at such games an admission fee is charged to those persons who desire to attend them; that physical training is a part of the curriculum of the school, although the playing of basket ball itself is not; that at sundry times during the school year, different classes of students in the school give plays and dramatic exhibitions, at some of which an admission fee is charged; that these basket ball games and plays are held with the full approval of the teachers and school board, no charge being made by the board for the use of the building, heat and light for these student activities; that no injury has resulted to the building in consequence of them; that while the money derived from the admission fees so charged is not paid over directly to the School District Treasurer, it is used to encourage interest in school athletic exercises, or to buy needed equipment for the school, and peculiarly for school purposes; that the auditorium or gymnasium aforesaid is used as a meeting place for the entire school at certain times during the school sessions; and that there have been no entertainments, dances or any other forms of activity given or held in the school building since its erection—they being invariably conducted in the evening and at times when the school is not in session—which have in any way interfered with the regular school work.

The action was commenced January 30, 1930, and the trial thereof was held October 6, 1930. During the month of June of that year, the annual meeting of School District No. 16 occurred, and at that meeting the electors of the district adopted a resolution approving all of the actions of the Board of Trustees ''in all that it has done in permitting said building to be used for various purposes, including public entertainment,'' and ratifying and confirming ''each and every act of said school board in each and every particular for which it has permitted the said building to be used since its erection.'' This resolution was offered in evidence by the defendants, and upon objection by the plaintiff, in substance that the same was immaterial in that as the acts complained of were unlawful or illegal no resolution of either part or all the electors of the district could cure the defect, the court excluded same. Upon the conclusion of the trial, as already indicated, judgment was given against the plaintiff, and the temporary restraining order issued upon the commencement of the action and which had been previously somewhat modified was dissolved.

For appellant it is insisted that the School District and its Board of Trustees, in permitting the use of school property for dances, meetings, carnivals and activities at which an admission fee is charged and from which the taxpayer is excluded unless he pays such admission charge, when that charge does not in any manner inure to the benefit of the School District and the burden of the taxpayer is further increased by the depreciation of the building, cost of light, heat and janitor service, is sanctioning an illegal use of public school property, and that the proven facts here establish that the actions of the Board of Trustees of School District No. 16, as detailed above, were done in violation of law. Our attention is directed to a line of authorities of which Spencer v. Joint School District, 15 Kans. 259, 22 Am. Rep. 268, and Bender v. Streabich, 182 Pa. 251, 37 Atl. 853, are typical. These decisions limit the use of school

property strictly and solely to school purposes, for the reason that money raised by taxation for one purpose cannot be used even indirectly for another, and that as a tax cannot be levied to build a structure for private use, it follows that a tax cannot be levied to build a school house which is used for other purposes. "Under these extreme decisions," says a well known recent text (24 R. C. L. 584, § 34), "it is held that it is immaterial whether an adequate rental is received or whether there is any actual interference with the use of the property as a school or any damage done to the property by the use." It may be here observed, further, that these decisions were rendered in states where the powers of school districts were not by law made as broad as those conferred upon like corporate bodies in Wyoming, as will presently be seen.

The question thus presented is an open one in this state, this court having never been called upon to pass on it, although it is a fact of common knowledge that during and at all times since territorial days in Wyoming, school buildings, by general consent, have been used, aside from school session hours, for a variety of purposes other than the holding of public schools—church assemblies of various denominations, dances, political meetings, lectures and entertainments of various kinds having been repeatedly held in them. With these conditions existing in this state, the following provisions of law, relative to the powers of school districts and district boards, were enacted December 10, 1869, and have since remained substantially unchanged in language, being carried forward by subsequent and repeated enactments and through various statutory compilations until the present time:

"The qualified electors of the district, when assembled, shall have power: * * *

"6. To direct the sale or other disposition to be made of any school house, or the site thereof, and of such other property, real or personal, as may belong to the district; and to direct the manner in which the proceeds arising therefrom shall be applied. * * *

384

"8. To delegate any and all powers specified in the foregoing sub-divisions to the district board; provided, that the district board shall not have power to vote or raise money as provided in sub-division five.

"9. To transact generally such business as may tend to promote the cause of education in accordance with the provisions of this and the succeeding chapter." (W. C. S. 1920, § 2239.)

"The district board shall make all contracts, purchases, payments and sales, necessary to carry out every vote of the district, for procuring any site for a school house, renting, repairing or furnishing the same, and disposing thereof, or for keeping a school therein, and performing such other duties as may be delegated to them by the district meeting." (W. C. S. 1920, § 2247.)

In Townsend v. Hagan, 35 Iowa 194, the statute (Revision of 1860, § 2028; Subdivison "Second", § 7 of c. 172, Laws of Iowa, 1862) conferred authority on the electors of the school district, when legally assembled, "to direct the sale or *other disposition* to be made of any school house * * * as may belong to the district." (Italics ours.) It will be noted that this provision is identical in language with the terms of subdivision "6" in Section 2239, W. C. S. 1920, quoted above. The electors of a school district in the state of Iowa, at their regular meeting, passed a resolution to authorize all religious denominations to hold their meetings in all the school houses of the district. Suit was brought to enjoin the defendants, the district officers, from permitting the school houses to be used for holding religious meetings and Sabbath schools therein. Affirming the decision of the trial court dissolving an injunction forbidding such action and responding to appellant's argument that holding religious meetings and Sabbath schools in the public school houses of the district was an illegal use of the same, and that neither the electors nor the officers of the district had any power to permit such uses, the court said:

"Whether a school-house or school-houses shall be sold or *otherwise disposed of* rests primarily with the electors of

the district. They have here given them the authority to sell a school-house or make such other disposition of it as they may determine. They may sell or lease it as they think proper, or permit it to be used for any proper purpose. Section 48 of the same chapter provides that the sub-director 'shall have the control and management of the school-house' (in his sub-district) 'unless otherwise ordered by a vote of the district-township meeting.' In the case before us the use of the several schoolhouses in the district for religious meetings and Sabbath-schools was permitted directly by a vote of the electors at a district-township meeting, so that in this particular the control and management of the school-houses is taken out of the hands of the sub-directors. Their authority in the premises is subject to the control of the electors of the township, who have exercised their authority and directed that the school-houses shall be opened for the use of religious worship and Sabbath-schools. * * * The position of appellant's counsel is that the electors have no power to permit the use of the school-houses for any purpose except for the use of the public schools. If this be correct, then the keeping of a select school in a public school-house would be prohibited, although it is conducted in all respects as a public school; and thus one taxpayer in the district could prevent, by injunction, any select schools being kept in the school-houses of the district, though every other person in the district desired them, and during a time of the year when there were no public schools kept in the district. There exists no reason for excluding Sabbath-schools from the school-houses that does not exist, also, to select schools. * * *

''We have seen that the statute confers the power on the electors of the district when legally assembled to make such disposition of the school-houses as they may deem right and proper. They may permit any reasonable and proper use of them which, in their discretion, may be determined upon. That the use in the present case is reasonable clearly appears from the facts agreed upon, and that it is proper, ought not to be questioned in a Christian State. Whether a court of equity will enjoin an abuse of the discretion, vested in the people of a school district, we do not, as we need not, determine. In this case we hold that there has been no abuse of discretion whatever.''

The same question was again raised in Davis v. Boget, 50 Iowa 11, where the district electors had adopted a resolution that, "all the school houses in said township should be opened for Sabbath school and religious worship, and lectures on moral and scientific subjects, at any time when it will not interfere with the regular progress of the schools;" in addition it was asserted that the use of the school building, sanctioned by the decision in Townsend v. Hagan, supra, was in conflict with a clause of the Iowa State Constitution, reading:

"The General Assembly shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to pay tithes, taxes or other rates for building or repairing places of worship, or the maintenance of any minister or ministry."

Adhering to its previous construction of the statute, nevertheless, the court said:

"In view of the fact that the statute construed in the case cited has been re-enacted by the General Assembly since that decision was made, and presumably with a knowledge of the construction put upon it by this court, we are not disposed to disturb the ruling in that case. * * *

"We may further say that the use for the purposes named is but temporary, occasional, and liable at any time to be denied by the district electors, and such occasional use does not convert the school-house into a building of worship, within the meaning of the constitution. The same reasoning would make our halls of legislation places of worship, because in them, each morning, prayers are offered by chaplains."

So in Nichols v. The School Directors, 93 Ill. 61, 34 Am. Rep. 160, where the statute provided that the directors might grant the temporary use of school houses, when not occupied by schools, for religious meetings and Sunday schools, for evening schools, for literary societies and such other meetings as they might deem proper, it was held that

an incidental use of a school building for the holding of religious meetings, not interfering with school purposes, would not be enjoined as illegal.

A case of similar purport is that of State ex rel. Gilbert v. Dilley, 95 Neb. 527, 145 N. W. 999, 1000, 50 L. R. A. (N. S.) 1182, where, in the concurring opinion, we find this language used:

"It must be conceded that any use of the schoolhouse which prevents it from being used for school purposes is clearly objectionable. In this case religious meetings were had occasionally, but whether to such an extent as to establish the character of the building as a place of worship may well be doubted. I do not think so. If the school officers should see fit to use the building for the purpose of hearing a lecture on geography, illustrated by maps and charts, there probably could be no good objection. If the lecture should be upon astronomy or any kindred educational subject there could not well be any serious objection. So of science and philosophy, law and literature. It is the opinion of the writer that to impart knowledge concerning religion and religious subjects is educational to the extent that our civilization covers and includes those subjects. I am unable to see that religion is so far removed from the general purposes of a school as not to be tolerated in a moderate degree. Religion is a part of our civilization. It is therefore, of necessity, part of our education. An intelligent discussion of religion and its kindred subjects approximates as nearly to the ordinary use of a schoolhouse as its use for the purpose of receiving a lecture on geography, philosophy, history, or agriculture. Chaplains at the legislature or at the penitentiary do not interfere with legislation or reform. The discussion of religion and its relation to our civilization ought to be educational and beneficial. The occasional use of the schoolhouse for such a purpose ought not to be denied."

See also Harmon v. Driggers, 116 S. Car. 238, 107 S. E. 923.

In the early case of Appeal of John W. Barnes, 6 R. I. 591, where at a special school district meeting there was a negative vote on a motion "that the district school house

be used for no other purpose than a public school house and district purposes," Barnes, a voter in said district, appealed from this decision, insisting that the school house could not be used for any purpose not connected with public education, without the general consent of the taxpaying voters of the district. The appeal was dismissed, and in the course of the opinion it was said:

"By the Revised Statutes, ch. 65, § 1, the custody of the district school-houses and other district property is confided to the trustees of the districts; and the question submitted is, in substance, whether the trustees of district No. 1, in Barrington, by permitting a private teacher of vocal music to give instruction in his art in the district school-house, out of school hours, have exceeded their authority, or violated their trust. Our school system, with all the intellectual and material means for instruction provided by it, was designed to promote public education; and any use of the school property tending to this end, and which does not interfere with the regular schools, may be permitted by the trustees of a school district, as within the spirit of their trust. It is evident, that this power of the trustees, must, to answer its purpose, be in some degree discretionary and obedient to circumstances; and it certainly should not be interfered with, either by the district, or on appeal, by the commissioner, except when exercised in a manifestly improper manner. * * *

"In the appeal of Isaac Hall, decided in 1853 by Ch. Just. Greene, after consultation with Justices Haile and Brayton, the conclusion come to, was, that a district school-house might be used 'for educational purposes collateral to the main purpose; such as, meetings of the district for school business, lectures upon literary and scientific subjects, debating societies for the people or children of the district,' &c.; and they approve the above language of the then commissioner, Hon. E. R. Potter, in giving his decision on that appeal.

"This opinion certainly includes, as within the power of the trustees and the district, the right to license the use of a district school-house, for private instruction, out of school hours, in vocal music. Instruction in this art, is quite commonly furnished in our public schools, to enable the children to join in an exercise always agreeable to them, and

to fit them to participate in one of the ordinary acts of public devotion. The use of the school-house, when not needed for the regular course, that the like instruction may be imparted to the scholars and others of the district, so that the knowledge and taste of all in this excellent accomplishment may be promoted, is quite in accordance with the uses to which such property is appropriated by law; and the last objection which a friend of public education should make to such a use is, that the people of the district are so desirous of such instruction, that they are willing to pay for it themselves."

Similarly, in Russell v. Dodds, 37 Vt. 497, where one H. was at first given permission by the Prudential Committee of the district to open in the district school house a private school for the children and vicinity—an object generally approved by the voters of the district, but who had not formally approved the project by corporate sanction—the permission being given for eleven weeks of school to be held, the committee, without any reason, excluded H. from the building. Holding this action to be wrong, the court remarked:

"It was held in Chaplin, et al. v. Hill, et al., 24 Vt. 528, that a private school not supported by a tax on the district, might by consent of the district be held in the school house, that such a school was for the furtherance of the general object and design of such erections, and so no unlawful use of the house, and that the prudential committee to whom by law the general care of the house is given, had no legal right to prevent the house being used for that purpose. If the district might properly and legally allow the house to be used for such purpose, we think in the absence of any dissent by the district, the prudential committee might do the same thing, and give permission to use the house for the same object, and especially if it was generally approved by the voters and tax-payers of the district.

"It is said in the case of Chaplin, et al. v. Hill, et al., above cited, that the district may allow the school house to be used for a private school for *the time being merely,* but cannot confer the exclusive use of the house upon any one for any definite time. But we apprehend that what is meant

by this is, that the district may not part with the use and power of control over the house permanently, or for any such length of time as to prevent the house from being used for the purpose of a district school, for which it is specially erected. If they may part with it at all, we see no reason why they may not part with it for such limited period as will not interfere with their legitimate and proper use of it as a district school house.''

The case of Cost v. Shinault, 113 Ark. 19, 166 S. W. 740, Ann. Cas. 1916 C 483, was a suit for an injunction against the directors of a school district to prevent them from leasing the second story of a school building to the local Odd Fellows Lodge for a specified rental for one year, with the option to renew the lease for five years, the district reserving the right to use the building for school exhibitions and entertainments of its own. After the contract was made, at the annual school election occurring some six months later, this lease was formally ratified by the electors of the district. The trial court found that no damage was inflicted on the building by reason of certain changes therein made by the lodge, that no interference resulted or would result to the school being taught then or thereafter by reason of the use of the building's upper story as a lodge room, and that the suit should be dismissed. Directing the attention of the reviewing court to a provision of law that directors could permit a private school to be taught in the public school house at such times as it was not occupied by a public school, unless otherwise directed by a majority of the district's legal voters, it was urged that this express grant of power was in effect a denial to let it for any other. Disapproving this contention and affirming the decision given below, the court had this to say:

''We should not hesitate to hold that the contract was void, if its performance interfered with the school. But the chancellor has expressly found that such was not the case. The electors of that district, who were the patrons of that school, voted for the ratification of the contract, and in

their depositions made it appear, by a preponderance of the evidence, that the schools were not being interfered with nor the building damaged. Upon the contrary, the revenues of the district were being supplemented by the annual rental in the sum of $50, and under the circumstances we think the contract was not an unlawful one, nor void as being against public policy. Of course, the district could not divert its funds for the purpose of building or providing lodge rooms for any association or society, however benevolent its purposes might be, neither would the directors have the right to make any contract which authorized the use of the school property in a manner which interfered with the schools. But as has been stated, that was not done in this case.

"It is a matter of common knowledge that many *quasi*-public uses are made of the rural school buildings of the State. We do not believe it was the purpose of the Legislature in granting express authority for private schools to be taught in the public school building, to exclude other uses where such uses do not interfere with the schools nor injure the buildings."

A like result was reached in Lagow v. Hill, 143 Ill. App. 523, affirmed on appeal 238 Ill. 428, 87 N. E. 369, 370, under the Illinois statute referred to above, where the school directors had leased part of the school building to several fraternal organizations, and the holding of the latter's meetings in no way disturbed or interrupted the school, and the use of the building by these societies did not, in any way, damage or injure the building or other school property.

While the use by cities of their public property is governed by statutes investing them generally with broader powers than those conferred upon school districts, and for that reason cases of that character may perhaps be distinguished from the one before us, yet in some respects they appear to shed some light upon the proposition which we are here obliged to consider, i. e. the use of public property absolutely and solely and at all times for the purpose for which it was originally procured. It seems to be generally conceded that a municipal corporation, having erect-

ed a building in good faith for municipal or public purposes, has the right, when such building is no longer used by the municipality, or when parts of it are not needed for public use, or when at intervals the whole building is not so used, and when it does not interfere with its public use, to permit it to be used, either gratuitously or for a compensation, for private purposes. See Bates v. Bassett, 60 Vt. 531, 15 Atl. 200, 1 L. R. A. 166; French v. Quincy, 3 Allen 9; Worden v. New Bedford, 131 Mass. 23, 41 Am. Rep. 185; Lowry v. Forest City, 39 Pa. Sup. Ct. 276.

Where statutory authority was given a city to rent its unused property and it owned a school building which was no longer needed or used for school purposes, a lease by the city to a regiment of the State National Guard for a nominal consideration was upheld. This conclusion was reached in a suit by taxpayers of the city, who were the owners of buildings rented by them for profit for concerts, exhibitions, entertainments and public meetings, to restrain the letting of the school building because the regiment, in order to provide additional money for itself, over what the Legislature had seen fit to give it, had agreed to rent the building aforesaid for concerts, meetings and other gatherings by organizations of private citizens and to turn over a share of the rental thereof to the mayor and city council of the city. Gottlieb-Knabe & Co. v. Macklin, 109 Md. 429, 71 Atl. 949, 31 L. R. A. (N. S.) 580, 16 Ann. Cas. 1092. In concluding the opinion in that case, this language was used:

"But the appellants still further contend that the hiring out of the public property for such entertainments as the record shows is an unconstitutional invasion of the rights of citizens engaging their property in that business, in that it is a deprivation of liberty and property without due process of law, and they have specially requested us to express an opinion upon this branch of the argument. This is not the case of a municipal corporation perverting the functions of government by deliberately and indefinitely engaging in business for profit, and entering into competition with its taxpayers, from whom it exacts a license which

it does not itself pay. It is but the temporary, casual, and incidental use of unused public property, done in the practice of a public economy to avoid loss of revenue upon such unused public property, and to lighten thereby the general burden of taxation. Such being, in our view, the case before us, we cannot sustain the constitutional objections of the appellants.''

In Lewis v. Bateman, 26 Utah 434, 73 Pac. 509, decided in 1903, it was held that the trustees of a school district had no right to permit a school house to be used for public and private dances, inasmuch as this would be a misappropriation of trust-property and opposed to the principle upon which the case of Spencer v. Joint School District 6, is grounded, as mentioned above. However, in the state of Utah, there was a statute which permitted a school house, when not occupied for school purposes, to be used for any purpose which would not interfere with the seating or other furniture therein. The record in the Lewis v. Bateman case showed that in order to hold the dances proposed, the seats in the school building had to be removed, thereby spilling the ink in them and disturbing the seating for school purposes. The decision is, in part at least, based upon the statute and its obvious violation shown by the facts in the case, these establishing a clear interference with the proper conduct of the school.

A statute of the state of Nebraska provided that: ''The Board of Education of every school district in which is included any incorporated city or village, may, in its discretion, permit the use of public school buildings for public assemblages under such rules and regulations as it may adopt.'' The same power was also accorded a majority of electors at any annual meeting in any rural school district. The Board of Education of North Platte, Nebraska, permitted orderly dance parties to be held in the auditorium of a school building controlled by it, under certain rules which it prescribed. Suit was brought to restrain the board from allowing dances. On the trial it developed that the

school building's auditorium, over a period of twelve years, had been used for every kind of athletic, social, patriotic and recreational purposes; that among the uses to which it had been applied were lectures, community gatherings, parties, institutes, 20th. Century Club meetings, School of Music, chautauquas, community choruses, minstrel shows, theatrical entertainments, and during the war for every form of patriotic advancement, including use for several months as a barrack for quartering a company of soldiers raised at North Platte. For each and all of these events, lights, janitor service and heat in the winter time was furnished by the taxpayers of the school district. The suit was dismissed by the District Court. On appeal the decision was affirmed. Concerning the opinion in the case of Spencer v. Joint School District 6, supra, the appellate court, in Brooks v. Elder, 108 Neb. 761, 189 N. W. 284, said:

"In the half century that has passed since this opinion was written by Judge Brewer wonderful changes have been taking place. The dusty roads of his day are now well oiled for fast flying motorcars, and in a few months patrons will gather nightly in schoolhouses to hear radio programs from far-distant cities. It is urged that our young people are vastly different in this day and should be more restrained, but we venture the opinion that the parents of today are just as different in their home life and personal habits from the parents of 50 years ago as our young people differ from those of that age."

And it was further remarked in comment on the fast developing phases of education:

"In some communities there are a larger number of equally good people who dance and teach their children to dance and who crave for their young children the protection of carefully supervised school dances. Shall such a demand be met at the expense of the taxpayers of a school district? Schools have installed chemical, physical, electrical, botanical, and biological laboratories, as well as meeting the demand for manual training in carpentry and blacksmithing. Domestic science and sewing classes render

efficient service in making homebuilders of our girls. Million-dollar public school buildings with great auditoriums and expensive stage apparatus have been constructed. The most complete gymnasiums with shower baths and swimming pools and highly paid men and women instructors are found in many cities. Athletic parks with amphitheaters of large seating capacity bring and accommodate the crowds which attend football and other games. Yet some parents can be found who object to each and all of these things. In spite of this the public schools have constantly grown in power and influence in both city and country and have, in many instances, become the one great community center for wholesome entertainment of all.''

Again, in McClure v. Board of Education, 38 Cal. App. 500, 176 Pac. 711, 712, where the statute of the state of California provided that:

''There is hereby established a civic center at each and every public schoolhouse within the State of California, where the citizens of the respective public school districts within the said State of California may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any and all subjects and questions which in their judgment, may appertain to the educational, political, economic, artistic and moral interests of the citizens of the respective communities in which they may reside; *provided,* that such use of said public schoolhouse and grounds for said meetings shall in no wise interfere with such use and occupancy of said public schoolhouse and grounds as is now, or hereafter may be required for the purposes of said public schools of the State of California.''

It was held against an application for an injunction that the Board of Education of the city of Visalia, California, was authorized to permit a social dance in the high school building.

Illustrative of the principle that the courts will interfere when the primary object is not to subserve a public purpose, but to promote some private end, it was held, in Sugar v. Monroe, 108 La. 677, 32 So. 961, 50 L. R. A. 723, that

the use of part of a school building by a municipality for theatrical performances *as a business* would be enjoined, where the building had been constructed with the proceeds accruing from a tax voted to be imposed for school purposes. But the court, in the course of its opinion reaching that result, significantly said:

"In expressing this conclusion, we do not wish to be understood as going to the extreme of holding that the city authorities may not make such casual and incidental use of the building in question, not inconsistent with, or prejudicial to, the main purpose for which it was erected, as they may deem advisable, nor as holding that changed conditions in the future may not justify them in devoting it to some other purpose. The question here presented is whether they have the legal right at this time to make use of it, or any part of it, for the purpose of maintaining a theater therein, or of giving theatrical performances, as a business; and this question we decide in the negative."

In Royse Independent School District v. Reinhardt, 159 S. W. (Tex. Civ. App.) 1010, it appeared that the Board of Trustees of the School District were vested by law with the exclusive management and control of its property. The board, by a contract, granted to a private corporation the privilege of using the south end of the public school campus as a baseball ground during the period intervening between the close of school in the spring and the commencement of school in the fall, and for a term of three years, for certain considerations and under certain restrictions as to orderly conduct, impairment of school property, etc. The action of the trial court, in granting an injunction restraining the trustees from performing this contract, was reversed, and it was held that such contract was within the power of the board to make.

An examination of comparatively recent decisions, relative to some phases of present-day administration of school property by boards of education, leads readily to an appreciation of the force of the remarks of the Supreme Court of

Michigan, in Attorney General ex rel. Sheehan v. Board of Education, 175 Mich. 438, 141 N. W. 575, 45 L. R. A. (N. S.) 972, to the following effect:

"Boards of education, supported by public sentiment and interest, now commit school districts to various measures and activities which our fathers would have regarded as revolutionary and intolerable. Measures which were once discarded, if they were ever considered in educational affairs, are demonstrably efficient in advancing the interests of education generally. Manual training schools and domestic science schools are examples of comparatively new approved departures in methods of public school training."

For example, in Ralph v. Orleans Parish School Board, 158 La. 659, 104 So. 490, the plaintiff was a citizen, property owner and taxpayer in the city of New Orleans, who had a retail merchandise establishment near a certain school building under the control of the Orleans Parish School Board. That board, by contract, allowed the janitresses of the building to sell lunches and comestibles in said school building to the teachers and pupils during lunch hours only, and at a small profit to the vendors. Plaintiff, relying upon the provision of the Constitution of Louisiana providing that—

"The funds, credit, property or things of value, of the state or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private."

sought an injunction to restrain the board from permitting such sales. Both the trial court and the Supreme Court of the state thought that the relief should be denied. Distinguishing the case of Sugar v. City of Monroe, supra, it was said on review:

"Our conclusion is that the mere sale of luncheons, etc., on the school premises, during lunch hours only, to teachers

and pupils only, under the circumstances and for the purposes set forth in defendant's answer, is only incidental to the main purpose of said schools, and is in the interest of the safe, sanitary, and efficient conduct of said schools, and that same is not an unlawful use of said buildings under such circumstances.''

So it was held in Goodman v. School District No. 1, City and County of Denver, 32 Fed. (2nd) 586, 63 A. L. R. 92, by the United States Circuit Court of Appeals, that the operation of cafeterias in school buildings during noontime of each school day, where food was sold to students, teachers, employees and occasionally to visitors, at prices sufficient to discharge operating expenses and to replace worn out equipment, profit over this being negligible, and where, except in individual cases, the students were not allowed to leave the school buildings during the noon intermission, was within the scope of the power conferred by the state constitution of Colorado upon boards of education to control instruction in the public schools of their respective districts. This conclusion was reached, despite a claim by the plaintiff that such conduct wrongfully augmented school taxation, amounted to a misuse of public property and deprived her of her property without due process of law.

The case of Bozeman, et al. v. Morrow, et al., 34 S. W. (2nd) (Tex. Civ. App.) 654, analogous to the two cases last above cited, decided January 8th of this year, was one where merchants engaged in business near the Austin Junior High School, selling candies, school supplies, etc., sought to restrain the Board of Trustees of the public schools of El Paso, Texas, from operating a cafeteria, the scope of whose operation is indicated by the following excerpt from the findings of the trial court:

''In the year 1922 there commenced to be operated in connection with said High School a cafeteria, and same has been operated ever since. This cafeteria sells lunches to the pupils attending said Austin High School, and in connection therewith desserts at or about the time of the luncheon, and selected candies.

"In connection therewith there is also sold such school supplies as tablets, pencils, pens and so forth. The purpose of the sale of these school supplies is to meet emergencies, and not for the ordinary use of the pupils of the school. The proceeds of the sale of school supplies go to the cafeteria fund. The original equipment for the cafeteria was purchased out of school funds. It has supported itself since. A lady is employed to superintend the cafeteria, and her salary is paid from the fund arising from the operation of the cafeteria, as are the supplies and labor. The net profit arising from the operation of the cafeteria, the sale of school supplies and candies, is negligible. The cafeteria is conducted in two rooms of the school building. The food and desserts supplied are sold at moderate prices, and are good and wholesome for growing children.

"With the consent and acquiescence of the School Board the teachers of Austin High School have promulgated and enforced a rule substantially as follows: The pupils are forbidden from leaving the school grounds at noon hour unless they have the written consent of their parents."

A statute of the state of Texas in part provided:

"No teacher or employee of the school engaged in the distribution of textbooks under this law as the agent or employee of the State, or of any county or district in the State shall, in connection with this distribution, sell or distribute, or in any way handle, any kind of school furniture or supplies, such as desks, stoves, blackboards, crayon, erasers, pens, ink, pencils, tablets, etc."

Holding that the statute was inapplicable and that the board was acting within its power, the decision of the trial court, refusing the injunction, was affirmed, the court saying in part:

"As to the discipline of the pupils of the school, in having them patronize the cafeteria, of which much is said, it is a sufficient answer that appellants' suit is not grounded upon any invasion of the liberty of the person of any pupil who may attend the school. They do not allege that any of appellants has a child attending that school. They sue only in the right of taxpayers, and, as to this part of the suit,

complain of alleged illegal use of the school building. On this branch of the case we have concluded that, since the board of trustees of the city of El Paso is given the power and it is made its duty in the exercise of the power given to adopt such rules and regulations as the board of trustees may deem proper in the school district under their control, and has the exclusive power to manage and govern said school, and all rights and titles to property for school purposes are vested in the board, and the board is given the power to employ a superintendent, principal, and such others as the board may deem necessary, said board is acting within the powers granted to it in establishing and maintaining the cafeteria shown by the evidence and found by the court, and to adopt and enforce such rules for the discipline and control of the school as the board may deem proper, and the courts may not interfere unless a clear abuse of power and discretion vested in the board is made to appear.''

Recurring now to the facts established by the record before us, as hereinabove set forth, and with the authorities hereinbefore given in mind, we are inclined to the view that the plaintiff is not entitled to the relief he seeks. It is perfectly clear that the activities in the school building owned by School District No. 16 and concerning which plaintiff complains, were all conducted out of school session hours, and that not one of them interfered in any way with the proper conduct or management of the school itself. Neither has the building or other property of the districts been in any way harmed or injured by any of these activities.

The qualified electors of the district are vested by law with power to direct the sale or other disposition of the school house, its site or any other district property. This power they may delegate to the district board, which in turn, through such authority, may make the necessary arrangements and contracts therefor. One of the well established meanings of the word ''dispose'' is, ''to assign to a use.'' We have seen that the Supreme Court of Iowa has several times, and, as we think, correctly, held identical statutory language conferring power upon the electors of

a school district to manage their affairs, to grant them the authority to make such disposition of the school house owned by the district as they regard right and proper and to permit any reasonable and proper use of it, which in their discretion they may determine. So it was decided to be a proper use to allow public assemblages for religious purposes in the school building when the district electors had voted approving such use. It seems to us that our statute, thus construed, is at least as broad in its scope as that in Nebraska, allowing public assemblages in the school buildings under rules prescribed by the district—and considered in Brooks v. Elder, supra—or that in California, permitting recreational activities in the school building, · where meetings may be held to discuss educational, political, economic, artistic and moral interests of the citizens— and applied in McClure v. Board, supra—or that in Illinois, designating as a proper use of the school building the holding there of religious meetings, evening schools, literary societies, and "such other meetings as the directors may deem proper,"—and applied in Lagow v. Hill, and Nichols v. The School Directors, supra.

In the cafeteria cases cited above, under the general power to control instruction in the public schools and school property, school boards were held authorized to permit private individuals to earn salaries from the profits of selling food and school supplies to students, teachers, and employees during the noontime recess and outside of school session hours, despite the protest of merchants who had their places of business near the school house and sold the same sort of merchandise to the public. Why may not the Parent Teachers Association of Moorcroft—an organization confessedly established to encourage interest in educational matters and of which plaintiff himself admits he was formerly a member—in the instant case, under our law, be permitted to sell lunches and hold an occasional entertainment, the monetary returns from which, over and above necessary expenses, are devoted to purchasing needed

equipment for the school and thus saving the taxpayers as a body additional expense? We are quite unable to see why this may not be done in the light of well-considered authority. As for the activities of the student body, in holding basket ball games and dramatic entertainments in the school building, the record shows that the money derived from them also is applied solely to school purposes and to encourage an interest in athletics—physical culture being on the curriculum of the school. Certainly the participation of students in the presentation of class plays in the building must be regarded as educational, instructing them in the art of self control, poise and the ability to think and speak before a public audience. Since the days of Euripides and Terence such exercises have been regarded as highly educational. While it is true the money derived from all these entertainments was not paid directly into the school district treasury, the use made of it accomplished the same result as if it had been.

Regarding the dance permitted by the school board to be conducted by the fraternal organization—the Knights of Pythias—it appears to have been obviously an orderly and law-abiding affair and one of the members of the school board himself attended it. The school district received compensation for the use of the building, more than sufficient to recompense any outlay it was obliged to make for light, fuel, etc. It would seem that such permitted use is far from presenting so strong a case as that of Cost v. Shinault, supra, and that of Lagow v. Hill, supra, where parts of the school building were formally leased to fraternal organizations for definite periods, and such action by the school districts was held proper.

So long as the proper maintenance and conduct of the school is not interfered with, or in any wise hampered, and so long as school district property is neither injured, defaced nor destroyed, as we view it our law vests a generous amount of discretion in the school district electors, in regular meeting assembled, concerning what use shall be made

of the school district property when it is not in actual service for formal school sessions. Our legislatures, over a period of some sixty years, have thought it quite safe, evidently, to trust such matters to the sound judgment of the several communities of the state in determining their respective needs. That this is a wise and salutary arrangement we have not the slightest doubt. It is especially manifest in view of the broadening sphere of educational activities. With that discretion we must decline to interfere in the case at bar, for in our judgment the law defining the powers of school districts has not been transgressed.

No question is made that the Board of Trustees, alone, had no authority to grant the uses of the building aforesaid—the argument has throughout the case been that neither they nor the electors of the district had such authority. It must be presumed, in the absence of a showing to the contrary, that the board acted rightly and in due accordance with the law, so far as having the requisite authority is concerned. This conclusion is the more readily reached when we note that the resolution approving each and all of the acts of the trustees, which resolution was passed at the regular annual meeting of the electors of the district, was excluded by the trial court, over plaintiff's objection only that neither any part nor all of the electors of the school district could authorize the building to be used for those functions of which complaint was made.

Some incidental questions of practice have been suggested by the briefs of the parties, but in view of the conclusions we have reached, as set forth above, we do not deem it necessary to consider them.

It follows that the judgment of the District Court of Crook County should be and is affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.