[No. 16070.    Department One.    January 4, 1921.]

## O. C. McGILVRA et al., Appellants, v. SEATTLE SCHOOL DISTRICT No. 1 et al., Respondents.[1]

SCHOOLS AND SCHOOL DISTRICTS (30, 53)—POWER TO INCUR INDEBT-
EDNESS—FREE MEDICAL SERVICES FOR PUPILS. A school district has
no authority to render free medical services to pupils by maintain-
ing a clinic for the treatment of school children of parents unable
to pay for regular professional services.

Appeal from a judgment of the superior court for
King county, Hall, J., entered December 5, 1919, upon
findings in favor of the defendant, in an action to
restrain a school district from maintaining medical
services for pupils, after a trial on the merits to the
court. Reversed.

*Edward Judd*, for appellants.

*Henry W. Pennock*, for respondent Seattle School
District No. 1.

PARKER, J.—The plaintiffs, McGilvra and others, res-
idents and taxpayers of Seattle School District No. 1,
of King county, suing for themselves and in behalf of
all others similarly situated, commenced this action in
the superior court for that county seeking an injunc-
tion to restrain the school district and its officers from
maintaining in one of its school buildings and expend-
ing funds of the school district for the maintenance
therein of a so-called "clinic," which, as we proceed,
we think it will appear would be more properly desig-
nated as a "hospital," for the medical, surgical and
dental treatment of the physical ailments of pupils of
the schools of the district whose parents or guardians
are financially unable to furnish such treatment. Trial

[1]Reported in 194 Pac. 817.

in the superior court upon the merits resulted in find-
ings and judgment denying the relief prayed for, from
which the plaintiffs have appealed to this court.

The controlling facts of this case are all embodied
in the findings of fact made by the trial court, the truth
of the facts so appearing not being challenged in any
respect. The findings read in part as follows:

"On the first day of April, 1914, the defendant,
Seattle School District No. 1 appointed Dr. Ira C.
Brown, a practicing physician, as school district med-
ical inspector. Prior to that date school medical in-
spection had been done by the health department of the
City of Seattle. . . .

"The city, at that time, was maintaining a general
clinic at the police station for the treatment of all
classes of indigent persons and others brought in by
the police. Dr. Brown, upon investigating the clinic,
found that certain school children were there brought
into direct contact with prostitutes, criminals and
other undesirable citizens. He called on several local
physicians informing them of the injury being done
these children at the city clinic, whereupon a number
of physicians, specialists, held a meeting at which it
was suggested that *a clinic for the treatment of school
children, of parents unable to pay for regular profes-
sional services, be established in some building owned
by the school district.*

"A number of physicians and dentists then volun-
teered to furnish their services free to maintain such a
clinic and this number was thereafter increased to a
staff of twenty-six. . . .

"Immediately after the appointment of Dr. Brown
as medical inspector, the school district fitted up cer-
tain rooms in an old building which had been formerly
occupied by the administrative officers of the district,
but which had been abandoned for new quarters in the
central building several months prior to Dr. Brown's
appointment. At first provision was made in this
building only for inspection of children, but after the
meeting of the physicians at which the school clinic

was suggested, the *school district made alterations in three (3) vacant rooms in the half story attic immediately above the quarters of the medical inspector, thereby making them suitable for the examination of children and performing operations. At the same time there was partitioned off from the main waiting room on the first floor, a room where two (2) dental chairs and equipment were installed.*

"Dr. Brown started to work in the above quarters with six (6) graduate nurses as deputies. The number of deputies was increased from year to year to meet the growing demands until the number so engaged is now twenty-four. . . .

"The nurse deputies are assigned to various schools in the district and are required to examine each child at least once a year for the purpose of determining *whether such child has any physical or mental defect interfering with his or her school* work and to exclude from attendance all children suffering from contagious and infectious diseases. The several nurses are required to report promptly to the medical inspector, who in turn reports to the school board and board of public health. *When children are found with physical defects which can be remedied,* the parents of such children are notified of the conditions found by the nurses and are advised to consult the family physician in relation thereto. *Upon the failure of the parents* to take any steps to relieve the children, a nurse visits the home of each child to ascertain the reason why the parents have taken no action. *If the nurse finds upon careful investigation that the parents are unable to pay the expense of treatment by a regular physician, such fact is reported in writing to the medical inspector and at the same time a card is issued by the nurses to the parents offering the privileges of the school clinic where the child or children may be thoroughly examined and treated if necessary, by the physician specialists above mentioned.* . . .

"Parents able and willing to pay small sums are asked to contribute such sums as they are able to contribute, to the maintenance fund used to defray the cost of materials and the services rendered by a nurse.

Some parents pay more than the cost of rendering the service to their particular children. . . .

"When the clinic opened, and for some time thereafter, the dental department was operated by volunteer dentists, but it was found impracticable to run this department without the *services of paid dentists.* In the first place a dentist was required for the boys' parental school, also for the girls' parental school, and this required more time than any volunteer dentist would give. In the second place, it was found that a thorough examination of teeth could not be made in the schools and that a dental equipment was required for the purpose. A graduate dentist was therefore appointed as deputy medical inspector and a second dentist was later added to the staff to examine the teeth of all school children sent to the clinic for that purpose and to treat the teeth of such children as had been given clinic cards. . . .

"Approximately one half of the time of the two dentist deputy inspectors has been employed in *the inspection of teeth, the remainder of the time of the dentists being employed in dental operations upon school children,* a part of which time was spent in the boys' parental school and the girls' parental school. *A nurse is assigned to the dental department who gives substantially all her time to the dentists inspecting and treating the children. The combined salaries of the two dentists and the dental nurse amounts to four hundred ninety ($490) dollars per month.* For the last school year the surgical operations and medical treatment in the school clinic (aside from the dentistry department), was more than self-sustaining; *including the dentistry department, there was a deficit of approximately two thousand ($2,000) dollars, due entirely to the dental operations performed in the clinic.*

. . .

"The number of operations and treatments in the said school clinic for the years 1915 to 1919, inclusive, are as follows:

"1919..............9,699.

"The clinic has ever since its establishment, performed dental and surgical operations and *treated chil-*

*dren during vacation months,* as well as during regular school sessions.

"The rules under which the said school clinic was generally operated from May 20th, 1914, to July, 1919, were as follows:

"1.  The clinic shall be open every day in the year at such hours as will meet the requirements of the service, for *diagnosing and treating school children who are unable to secure proper medical attention otherwise.  . . .*

"6.  It is expected that the clinic will be self-supporting, but to provide for emergencies an amount not to exceed $50 per month will be allowed."

We have italicized certain portions of these quotations from the court's findings which we regard as worthy of particular notice.  There also appears in the findings an itemized statement of receipts and expenditures, which seems to indicate that the total deficiency has been much greater than the $2,000 mentioned in connection with the dentistry department; also, that the use of the rooms of the school buildings is not only being furnished free of rent, but that the rooms were equipped with furniture and appliances for the rendering of medical, surgical and dental services to the pupils; all at the expense of the district. The amount of the value of the use of the rooms, and the amount of expense incurred by the district in maintaining the clinic, does not appear in the court's findings with any degree of accuracy; but it is plain from the findings taken as a whole that the officers of the district are incurring expenses and expending its funds in the maintenance of the clinic in an amount substantially in excess of that required in the furnishing of medical, surgical and dental treatment as is necessary to be furnished to the pupils of the district's parental schools, which necessary expenditures we leave entirely out of consideration in our present inquiry because the

question of the power of the district to make such expenditures is not here in question. It may be noted that parental schools are maintained under § 8605, Rem. Code, and following, for the care and custody of pupils committed thereto by due process of law, which in effect removes them from the care and custody of their parents or guardians. To summarize, we have the fact that the officers of the school district are maintaining in one of its buildings a so-called "clinic," equipped with appliances for rendering of medical, surgical and dental services in the treatment of the physical ailments of pupils of the schools, at the expense of the district in substantial excess of that necessary for the rendering of such services and treatment to pupils of the district's parental schools and that they propose continuing so to do.

The question to be here answered is, has the school district and its officers legal authority for so furnishing the use of, and equipping rooms in its buildings and the maintenance therein of such clinic, by the expenditure of the taxpayers' funds collected and placed at their disposal, for the sole purpose of maintaining the public schools of the district? At the outset let us be reminded in the language of Judge Dillon in his work on Municipal Corporations, quoted with approval by this court in *State ex rel. Winsor v. Mayor and Council of Ballard,* 10 Wash. 4, 38 Pac. 761, that,

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: *First,* those granted in express words; *second,* those necessarily or fairly implied in or incident to the powers expressly granted; *third,* those essential to the declared objects and purposes of the corporation—not simply convenient but indispensable. Any fair or reasonable doubt concerning the existence of power is resolved by

the courts against the corporations, and the power is denied."

This view of the law is of added weight when applied to school districts, because they are municipal corporations with powers of a much more limited character than are cities or towns, or even than counties. *Howard v. Tacoma School District No. 10,* 88 Wash. 167, 152 Pac. 1004, Ann. Cas. 1917D 792; 24 R. C. L. 564.

The whole of the laws, found in our school statutes, which we regard as lending any support whatever to the view that the school district and its officers possess the powers which the officers of the district are assuming, and threatening to continue to exercise, are the following:

"No teacher, pupil or janitor shall be permitted to attend school from any house in which smallpox, varioloid, scarlet fever, diphtheria or any other contagious or infectious diseases are prevalent. No teacher, pupil or janitor shall be permitted to return to school from any house where the above-mentioned diseases, or any form of them, have prevailed, until three weeks shall have elapsed from the beginning of convalescence of the patient, or upon the certificate of a registered physician in good standing that there is no danger of contagion. In case of whooping cough, chicken-pox and measles, certified by a physician to be not of a malignant character, this rule shall not apply to teachers, pupils or janitors who have had the diseases and have entirely recovered from them: Provided, that no pupil, teacher, or janitor can attend school or be employed who is afflicted with the pulmonary tuberculosis." § 4410, Rem. Code.

"Thirteenth: To appoint a practicing physician, resident of the school district, who shall be known as the school district medical inspector, and whose duty it shall be to decide for the board of directors all questions of sanitation and health affecting the safety and welfare of the public schools of the district; he or authorized deputies shall make monthly inspections of

each school in the district and report the condition of the same to the board of education and board of health: Provided, however, that children shall not be required to submit to vaccination against the will of their parents or guardian." Laws of 1919, chap. 90, p. 215, § 9, amending § 5409, Rem. Code.

We are quite unable to find in these statutory provisions any power given to the school district officers, other than the power to cause inspection of the buildings and premises of the district to be made with a view to making them sanitary and healthful, and to cause inspection of persons with a view to the exclusion from the school premises of all persons afflicted with contagious diseases, to the end that such diseases shall not obtain a foothold among the pupils and other persons whose duties require them to be upon the school premises.

Counsel for the school district officers call our attention to, and rely upon our decision in *State ex rel. School District No. 56 v. Superior Court,* 69 Wash. 189, 124 Pac. 484, and *Sorenson v. Perkins & Co.,* 72 Wash. 16, 129 Pac. 577, commonly known as the "playground" and "gymnasium" cases, wherein it was held that a school district has the power to acquire, by expenditure of the funds of the district, additional land for playgrounds for the pupils and also at the expense of the district to construct and equip gymnasiums. We do not think these cases are of any controlling force touching the present inquiry. Playgrounds in connection with public schools have for generations been so common that it must be presumed that the legislature, by giving the general power to maintain public schools, incidentally intended to also give the authority to provide such playgrounds in connection therewith; and while gymnasiums in connection with public schools have not been so common, the work and

exercise of the students carried on therein is manifestly so intimately connected with the education of the pupil as to warrant the assumption that the legislature intended the school districts and their officers to possess the power of providing the same as a proper public school equipment. The rendering of medical, surgical and dental services to the pupils, however, is, and always has been, we think, so foreign to the powers to be exercised by a school district or its officers that such power cannot be held to exist in the absence of express legislative language so providing.

When we look to the powers of the school district and its officers specifically enumerated in our school code, it becomes, we think, even more apparent that there is not in our statutes any legislative intent, expressed even inferentially, to confer upon the school districts this power. Among the twenty-two specifically enumerated powers, in the statute, we note the following:

"Tenth. To authorize the school room to be used for summer or night schools, or for public, literary, scientific, religious, political, mechanical and agricultural meetings, . . .

"Eleventh. To provide and pay for transportation of children to and from school when in their judgment the best interests of their district will be subserved thereby, . . ." § 4481, Rem. Code.

"Tenth. To provide free text books and supplies for all children attending school, when so ordered by a vote of the electors; or, if free text books are not voted by the electors, to provide books for children of indigent parents, on the written statement of the city superintendent that the parents of such children are not able to purchase them." § 4509, Rem. Code.

The specific legislative enumeration of these powers which it seems could, with much sounder reason, be considered as implied powers in the absence of express

language in the statute than the claimed powers here in question, argues, in the light of well settled rules of statutory construction, that the legislature has not intended that there should be an exercise of such claimed powers. We see no argument lending any substantial support, in a legal way, to the view that this school district and its officers possess the powers they are seeking to exercise and threatening to continue to exercise. There is much in the argument of counsel for the school officers which might be considered as lending support to the view that such powers ought to be possessed by the school district and its officers, and it is probable that counsel has many well meaning people upon his side of that question. The legislature may give heed to such arguments, but the courts cannot do so.

The judgment of the trial court is reversed and the case remanded to that court with directions to render a judgment enjoining the school district and its officers from furnishing or equipping upon the school premises or elsewhere, appliances for the medical, surgical or dental treatment of the physical ailments of the pupils of the schools at the expense of the district, and from employing physicians, dentists or nurses for the rendering of such medical, surgical or dental treatment; it being understood, however, that such injunction shall not restrain the school district or its officers from the doing of these things at the expense of the district in connection with, and as may be necessary in, the maintenance of the parental schools of the district and the proper care of the pupils committed to such schools.

HOLCOMB, C. J., MACKINTOSH, and BRIDGES, JJ., concur.