## BEARD v. BOARD OF EDUCATION OF NORTH SUMMIT SCHOOL DIST. et al.

No. 5159.   Decided December 10, 1932.   (16 P. [2d] 900.)

*Badger, Rich & Rich,* of Salt Lake City, and *P. H. Neeley,* of Coalville, for appellants.

*Homer Holmgren,* of Salt Lake City, for respondent.

*Wm. H. Leary,* of Salt Lake City, amicus curiae.

FOLLAND, J.

This suit was brought by plaintiff, a taxpaying citizen of the North Summit school district and owner of a competing opera house, for an injunction against defendants to perpetually restrain and enjoin them from allowing or permitting the North Summit High School building to be used for the holding therein of public or private dances, shows, dramas, motion picture shows, operas, basket ball games, and other kinds of entertainments not connected with or part of the school curriculum or course of study, and for which an admission charge is made, and from allowing and permitting the transportation equipment of the school district to be used in connection with such entertainments to transport students to and from the same free of charge, and from allowing the school property to be used for commercial purposes in competition with plaintiff's opera house, and from using funds derived from taxation to defray the cost of maintenance, upkeep, lighting, heating, janitor services, and

transportation services incident to the holding of such entertainments at the high school building and property.

From a judgment in favor of plaintiff and enjoining the defendants, this appeal is taken. The many assignments of error are directed chiefly to the overruling of the demurrer to the complaint, and to the refusal of the court to make other and different findings, conclusions, and decree. Able, exhaustive, and helpful briefs were submitted by counsel for the respective parties and by William H. Leary, attorney for the University of Utah, as amicus curiae. The University of Utah filed its brief on grounds of interest, because "the activities of the University may be subject to similar attack," and "as the highest branch of the system of public education in this state it is intimately concerned that the cause of education be promoted by the court's decision."

The facts shown are these: Plaintiff is a taxpaying citizen of Summit county, Utah, who for twenty-five years has been and now is the owner of a hall called the "opera house," in which are held dances, motion picture shows, theatrical plays, and other entertainments; that the business of the opera house has materially decreased until it is now an unprofitable enterprise; that this condition is claimed to have been caused by the use of the high school building and grounds for similar entertainments. The North Summit High School is located at Coalville, the county seat of Summit county, and is controlled by the board of education of the North Summit school district, a consolidated school district. The school building is a new, commodious, and fireproof structure, which has, in addition to classrooms, an auditorium with a stage, scenery, and other equipment including a projecting machine for visual education and motion picture displays; a modern gymnasium fully equipped with shower baths and toilets; and an athletic field adjacent to the school building with a cinder path, football field, playground equipment such as swings, teeters, horizontal bars, swinging rings, and trapezes. The building

and grounds are fully equipped for school purposes and also for use as a social and community center by the people of the community for social, recreational, and educational purposes. The school authorities have permitted the high school building and grounds to be used for a course of lyceum lectures, musical entertainments, dances, motion picture shows, football and basket ball games, and other entertainments and activities, for many of which an admission fee is charged, and to which the general public has been invited to attend by various schemes of advertising. The school trucks were permitted to be used in transporting the students and sometimes their parents and other members of the public to and from these entertainments and activities without charge. Usually the student body paid the wages of the truck drivers, but the cost of gasoline, oil, repairs, and upkeep was borne by the school district. In connection with the school, there is an organization known as the student body, which is organized by the students for self-government and to carry on social, athletic, and entertainment activities which are termed extracurricular activities. A charge is made for membership in this organization of $5 per year for students of the ninth, tenth, eleventh and twelfth grades and of $3 per year for those of the seventh and eighth grades. Payment of the fee gives to the student the privileges incident to membership, and, in addition thereto, admission without further charge to certain of the games, dances, lectures, and entertainments conducted by the student body organization. Most of the shows, games, dances, lectures, and entertainments about which plaintiff complains have been conducted by the student body, and some of the dances and entertainments have been conducted by clubs and classes of the school. The money received by the student body from its membership fees and admissions to its entertainments and other activities is kept in a separate fund and expended by the student body officers, under control of the school authorities, and is not mingled with the money in the school treasury. No rental has been charged

the student body or the school clubs and class organizations for the use of the building and grounds for these purposes, and the cost of lighting, heating, and janitor service, where these were necessary, has been borne by the school treasury. Any money remaining in the student body fund at the end of the year has been used for some purpose connected with the school, such as the purchase of a piano, moving picture machine, a panatrope, scenery, statuary, and paintings for the use and benefit of the school, and the building of fences and other improvements to the athletic grounds. All these entertainments and athletic contests were held at a time when school was not in session, did not interfere with the regular school work, and did not disturb or interfere with the seating or other furniture or property of the school, and were supervised by the principal or teachers of the school.

The complaint contains two causes of action. The allegations of each are substantially the same except that in the first count plaintiff seeks relief as a taxpaying citizen to restrain an alleged unlawful use of school property, and in the second as the owner of the opera house to restrain the use of the school property in direct and unfair competition with the operation of his opera house.

There are no allegations in the second cause of action which bring the case within the theory of "unfair competition" as known to the law.

"Unfair competition consists in passing off or attempting to pass off, upon the public, the goods or business of one person as and for the goods or business of another." 38 Cyc. 756. See, also, 26 R. C. L. 875.

It is contended by plaintiff that to use a tax-exempt, tax-supported institution to compete with a taxpayer is manifestly unfair and constitutes unfair competition. If the use made of the school building and grounds is lawful, it matters not that such use is competitive with plaintiff's opera house, or that plaintiff's income has

been impaired by such competitive use. When free public schools were first established, they competed with and ultimately drove from the field numerous private schools, but those who conducted the private schools could not complain of unfair competition since the state had the right to establish the free school system. Universities and colleges established by the states are in direct competition with privately controlled colleges, but the competition is not unfair nor unlawful because the state has the power to establish its universities and colleges, and to support them by taxation. Municipal waterworks and electric lighting plants may compete with those privately owned, but the competition is neither unfair nor unlawful where the municipal plants are established and operated pursuant to lawful authority. *Andrews* v. *City of South Haven*, 187 Mich. 294, 153 N. W. 827, L. R. A. 1916A, 908, Ann. Cas. 1918B, 100; *Young* v. *Board of Trustees*, 90 Mont. 576, 4 P. (2d) 725; *Security National Bank* v. *Bagley*, 202 Iowa 701, 210 N. W. 947, 49 A. L. R. 705; *Bozeman* v. *Morrow* (Tex. Civ. App.) 34 S. W. (2d) 654. The intent of a party to draw custom from a competitor is not actionable unless his acts are unlawful. *American Automobile Ass'n* v. *American Automobile Owners' Ass'n* (Cal. Sup.) 13 P. (2d) 707.

In *Speyer* v. *School District*, 82 Colo. 534, 261 P. 859, 57 A. L. R. 203, it was held the complaint stated a cause of action where it alleged that defendant maliciously, and without just cause, and with the express intention of destroying the business operated by plaintiff, made effective a rule that pupils must lunch at the school building, except on written request of parents for them to lunch at home, and were forbidden to trade with plaintiff, and that the purpose of the rule was to force business to the school cafeteria operated by defendants for profit. The court said the purpose or motive here was to injure another, but that, if the rule had been made in good faith for the good of the pupils and the school, the fact that it injured plaintiff's business would be of no consequences.

Plaintiff has no constitutional or other legal right to enjoy a monopoly in his line of business because he may have been first in the field. Undoubtedly the revenues from the use of his opera house are affected adversely by the use of the school building for entertainments and activities, some of which might, but for such use of the school building, be held in his opera house. He has no legal right to complain merely because of the competition. If this competitor had been a person or corporation which by reason of owning a more commodious and sanitary hall or one more centrally located had attracted business away from his opera house he would have no ground for legal action. Neither can there be ground for complaint here if the schoolhouse is being used in a manner and for a purpose authorized by law. Any right which he may have to question the power of the board of education and to enjoin such board from the exercise of powers beyond its jurisdiction is sufficiently asserted in the first cause of action wherein plaintiff sues as a taxpaying citizen of the district. The demurrer to the second cause of action should have been sustained. We shall not further refer, in this opinion, to the second cause of action or to the findings of fact and decree based thereon.

The first cause of action is not vulnerable to a general demurrer because it states such a cause of action as may be maintained by a taxpaying citizen of the district. In this count it is alleged that the plaintiff is a resident, citizen, and taxpayer of the North Summit school district; that the board of education has made a use of the building which is beyond its powers to do, and that such use had imposed additional financial burdens on the taxpayers; that the entertainments complained of have been held for private commercial purposes and for profit; that none of the proceeds therefrom have gone into the treasury of the school district; and that the expenses of such entertainments for fuel, light, janitorial and other services, and for transportation services rendered in connection there-

with, have been paid out of the tax funds of the district, and impose additional and unlawful burdens on the taxpayers; that the board of education threatens to continue such alleged unlawful acts; and that plaintiff has no adequate remedy at law. An action may be maintained by a taxpayer to enjoin and restrain the school authorities from acting beyond the scope of their powers or in violation of law where the remedy by law is inadequate. 32 C. J. 251; *Security National Bank* v. *Bagley,* supra. The demurrer to the first cause of action was properly overruled.

The question for determination is one of power rather than of policy. It is whether the board has exceeded its powers in permitting the use of the high school building for the lectures, shows, and entertainments referred to, and will in the future exceed its authority by continuing to permit such use as it threatens to do, unless restrained by the court. It is well established that, if the action of the board of education is within the powers conferred upon it by the Legislature, and pertains to a matter in which the board is vested with authority to act, the courts will not review the action of such a board to substitute its judgment for that of the board as to matters within its discretion. *Security National Bank* v. *Bagley,* supra; 24 R. C. L. 573; *Schmidt* v. *Blair,* 203 Iowa 1016, 213 N. W. 593; *McClure* v. *Board of Education,* 38 Cal. App. 176 P. 711.

"The courts will not interefere with the exercise of discretion by school directors in matters confided by law to their judgment, unless there is a clear abuse of the discretion, or a violation of law. So the courts are usually disinclined to interfere with regulations adopted by school boards, and they will not consider whether the regulations are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the board. Acting reasonably within the powers conferred, it is the province of the board of education to determine what things are detrimental to the successful management, good order, and discipline of the schools and the rules required to produce these conditions. The presumption is always in favor of the reasonableness and propriety of a rule or regulation duly made. The reasonableness of regulations is a question of law for the courts." 24 R. C. L. 575. See McQuillan, Municipal Corps.

(2d Ed.) 421; *McLeod* v. *State ex rel. Colmer*, 154 Miss. 468, 122 So. 737, 63 A. L. R. 1161.

The powers of the board of education are statutory since the Legislature may authorize the governing authorities of school districts as the state's agents to do anything not prohibited by the Constitution. *Young* v. *Board of Trustees,* supra. The board of education, being a creation of the Legislature, has only such powers as are expressly conferred upon it and such implied powers as are necessary to execute and carry into effect its express powers. *Royse Independent School District* v. *Reinhardt* (Tex. Civ. App.) 159 S. W. 1010. The court is not concerned with the policy, expediency, wisdom, or justice of a legislative enactment conferring powers on boards of education of school districts, and where such authorities act within their powers, in the absence of a clear abuse, the courts will sustain the exercise of such power. *Young* v. *Board of Trustees,* supra.

It is provided by article 10, § 1, of the Constitution, that

"the Legislature shall provide for the establishment and maintenance of a uniform system of public schools, which shall be open to all children of the State, and be free from sectarian control."

Section 2 of the same article provides that

"the public school system shall include kindergarten schools; common schools, consisting of primary and grammar grades; high schools, an agricultural college; a university; and such other schools as the Legislature may establish. The common schools shall be free. The other departments of the system shall be supported as provided by law."

By statute the Legislature has provided for the creation of county school districts. The board of education of each district is a body corporate with powers to sue and be sued, and to take, hold, lease, sell, and convey real and personal property as the interests of the school may

require. Comp. Laws Utah 1917, § 4616. By Comp. Laws Utah 1917, § 4598, it is provided that

"all public schools and school property therein shall be under the direction and control of the board of education" of the district, and by section 4617 the board may "do all things needful for the maintenance, prosperity, and success of the schools, and the promotion of education * * * and make and enforce all needful rules and regulations for the control and management of the public schools of the district."

These sections vest in boards of education the entire control of the public school system, including the schools and school property within their respective districts. *Salt Lake City* v. *Board of Education of Salt Lake City*, 52 Utah 540, 175 P. 654. Other statutes specifically authorize boards of education to permit school buildings and grounds to be used for certain specified purposes, and also impose limitations upon the power of the board with respect thereto.

Comp. Laws Utah 1917, § 4551:

"There is hereby established a civic center at each and every public school house within the state of Utah, where the citizens of the respective school districts within the state of Utah may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any and all subjects and questions which, in their judgment, may appertain to the educational, political, economic, artistic, and moral interests of the citizens of the respective communities in which they may reside; provided, that such use of said public schoolhouses and grounds for said meetings shall in no wise interfere with such use and occupancy of said public schoolhouses and grounds as is now or hereafter may be required for the purposes of said public schools of the state of Utah."

Section 4552:

"Lighting, heating, janitor service, and the services of a special supervising officer when needed, in connection with such use of public school buildings and grounds, as set forth in § 4551, shall be provided for out of the county or special school funds of the respective school districts in the same manner and by the same authority as such similar services are now provided for. Such use of the said school-

houses, property, and grounds shall be granted free; provided, that in case of entertainments where an admission fee is charged, a charge may be made for the use of said schoolhouses, property, and grounds."

### Section 4553:

"The management, direction, and control of said civic center shall be vested in the board of directors of the school district. Said board of directors shall make all needful rules and regulations for conducting said civic center meetings and for such recreational activities as are provided for in § 4551; and said board of directors may appoint a special supervising officer who shall have charge of the grounds, preserve order, protect the school property, and do all things necessary in the capacity of a peace officer to carry out the provisions and the intents and purposes of this chapter."

### Section 4554:

"The provisions of this chapter shall not be mandatory upon the board of directors of any school district, in respect to their authority and right to exercise discretionary powers as to refusal of the use of such schoolhouse for any such purpose or purposes; but whenever, in their judgment, it seems inadvisable to permit the use of such schoolhouse for the purpose requested, the board shall have the power and authority to refuse the use of such schoolhouse for any of the purposes mentioned in this chapter."

### Section 4587 (added by chapter 87, Laws of Utah 1923):

"All boards of education of school districts are hereby authorized and empowered to permit public school houses, when not occupied for school purposes and when the use thereof will not interfere in any way with school purposes, to be used for any purpose that will not interfere with the seating or other furniture or property; and shall make such charges for the use of same as it may decide to be just, but for any such use or privilege the district shall not be at any expense for fuel or for service of any kind or nature, provided that public school houses shall not be used for commercial purposes."

Laws of Utah 1923, c. 100, authorizes cities, towns, counties, and school districts to acquire, maintain, and operate athletic fields, gymnasiums, and other recreational centers and facilities. By this act such local authorities are authorized to

"organize and conduct plays, games, calisthenics, gymnastics, athletic sports and games, tournaments, meets and leagues; dramatics, moving picture shows, pageants, festivals and celebrations; community music, vocal and instrumental; clubs, debating societies, public speaking, story telling, picnics, hikes, excursions, camping, handicraft activities, socials and other forms of recreational activity that will employ the leisure time of the people in a constructive and wholesome manner."

These sections are unusually clear and definite, and indicate a legislative intent to vest in the respective boards of education a wide discretion with respect to the uses, in addition to uses for strictly school purposes, to which school property may be devoted. It was intended that the respective schoolhouses should become real civic centers for activities of the nature mentioned, not only by students of the schools, but by others of the adult population. The Legislature of Utah has gone as far as the Legislature of any state, and much farther than some, towards promoting recreational activities to occupy the leisure time of the people. It is the aim of modern educators to expand the educational system so as to keep the interest and employ the energy of school children during their leisure time, and in this way prevent children from getting into mischief and becoming law violators. These are useful and wholesome preventive measures which save children from delinquency and the state from additional expense in connection with penal institutions. Such activities, so far as conducted in connection with the school, are usually termed extracurricular activities, for the reason that, while they are necessary in a modern school system, they are in excess of the minimum requirements of a school curriculum.

By these enactments the Legislature has enlarged the scope of an educational program which the state may furnish to its citizens, both children and adults, and has opened the door of opportunity to the boards of education of the several school districts for the widest possible use of public school property in the interest of community development.

The school property is owned by the people of the community, and this legislation permits its use, under proper control and supervision, by the people of the district for all civic and community purposes, including recreational activities. The only express statutory limitations on the power of the board are those contained in section 4587 requiring payment to the district of cost of light, heat, and janitorial service, that the use shall not interfere with the seating, furniture, or other school property, and "that public school houses shall not be used for commercial purposes," in section 4551, that use for school purposes be not interfered with, and in section 4552 that as to the activities and meetings therein mentioned use of the school property shall be granted free with discretion in the board to make a charge for the use of the property in case of entertainments where an admission fee is charged.

It is argued by respondent that there is conflict between sections 4552 and 4587 with respect to the provision regarding expenses for light, heat, and janitor service. Section 4552 provides that the cost of these services shall be paid out of the county or special school funds, while section 4587 provides that the district shall not be at any expense for fuel or for service of any kind or nature. It is contended that section 4552 should be construed as being modified and limited by the provisions of section 4587 so as to require payment to the district of the cost of fuel, light, janitorial, and other services, and that, if not so modified and limited, the provisions of section 4552 are unconstitutional and void as an attempt "to authorize the use of money dedicated and set aside as a trust fund for the support of the common schools for a purpose foreign thereto." All the sections of the statute relating to the subject-matter of use of school property should be construed together and harmonized, if possible, in order to give effect to the legislative intent. We think any possible conflict between the two mentioned sections disappears when the subject-matter of each is considered. The sections refer, not to

the same thing, but to different subject-matter. Section 4552 refers to two kinds of uses: (a) Supervised recreational activity, and (b) meetings of citizens of the district for the discussion of educational, political, economic, artistic, and moral matters of interest. As to (a) these are activities which the board itself may inaugurate and make provision for proper supervision. The term "recreational activity" includes in its general meaning games, sports, and plays, *Corey* v. *Bath,* 35 N. H. 530; and dances, *McClure* v. *Board of Education,* supra. All such activities are included within the meaning of the term "entertainment." *Young* v. *Board of Trustees,* supra. The board may, but is not required to, provide these activities and supervise them in the interest of public marals and welfare. It may pay the expenses of such supervision out of its treasury. The uses included in (b) are not called in question in this case, but obviously the board has been given a wide discretion to permit the use of school buildings for meetings of citizens of the district for the various purposes mentioned. All these activities bear a close relation to the educational needs of the community. By the statute the board may, in its discretion, impose a charge for the use of the building where entertainments are held under its supervision and an admission fee is charged. It is for the board, and not for the courts, to say when a fee shall be exacted for such use of the schoolhouse. Obviously, when a rental charge is made, the proceeds should be paid into the treasury of the district.

Section 4587 has reference to other uses to which the building may be put, by permission of the board of education, where the entertainment or activity is not instituted by the board or held under its direct supervision. Under such a grant of power, or even under general powers, the courts have held that the boards may rent the school building for private purposes, where such use does not conflict with the use of the property for school purposes, *Royse Independent School District* v. *Reinhardt,* supra; for supervised dances, *Greenbanks* v. *Boutwell,* 43 Vt. 207; for dances

conducted by a lodge, *Merryman* v. *School Dist. No. 16,* 43 Wyo. 376, 5 P. (2d) 267; and dances not supervised and conected with school activities, *Young* v. *Board of Trustees,* supra; for religious services and similar uses, *Nichols* v. *School Directors,* 93 Ill. 61, 34 Am. Rep. 160, *Townsend* v. *Hagan,* 35 Iowa 194, *Davis* v. *Boget,* 50 Iowa 11, *State ex rel. Gilbert* v. *Dilley,* 95 Neb. 527, 145 N. W. 999, 50 L. R. A. (N. S.) 1182, *Harmon* v. *Driggers,* 116 S. C. 238, 107 S. E. 923; lodge and other meetings, *Cost* v. *Shinault,* 113 Ark. 19, 166 S. W. 740, Ann. Cas. 1916C, 483, *Lagow* v. *Hill,* 238 Ill. 428, 87 N. E. 369; lectures and other meetings, *Sheldon* v. *Centre School Dist.,* 25 Conn. 224; for private instruction in music, Appeal of John W. Barnes, 6 R. I. 591. By this section, where the school property is permitted to be used for purposes other than school purposes or supervised recreational or educational activities, the requirement is that the board shall charge a rental for such use at least sufficient in amount to cover the cost of light, heat, janitorial, and other services. There is a clear distinction between the uses for which, under section 4552, the board may furnish the building free of charge, and the uses referred to in section 4587 for which a charge shall be made. It is, of course, the duty of the board to make a charge for uses under section 4587, and it may or may not charge a fee for the use of the building where the entertainments are supervised or conected with school activities even where an admission fee is collected as contemplated in section 4552.

We are not impressed with the argument that the authorization of the free use of school property contained in section 4552 is void and in conflict with the enabling act and Constitution because making an improper use of trust funds derived from the sale of school lands, the income from which by the enabling act and the Constitution is dedicated exclusively to the support of the common schools of the state. There is no showing in the evidence that such funds have been or will be drawn upon in the maintenance of this high school, or for the lighting, heating, and janitorial services

in connection with the activities for which the building has been let free of charge. There is no finding of fact by the trial court to that effect. On the contrary, the finding is that such expenses have been paid out of money received from taxation.

The decree entered on the first cause of action naturally divides itself into two parts. Pargraphs numbered 1, 2, and 3 are in the nature of conclusions of law, and paragraphs 4 and 5 directly enjoin the defendants from the doing of certain specified acts. The conclusions stated in the first part of the decree are these: (1) That the student body organization is no part of the educational system of the North Summit High School, but is in the nature of a private organization; (2) that the duties of the board of education or of the school district or defendant officers cannot be delegated to the student body; (3) that the "entertainments and activities fostered and held by said student body are private in nature and do not comprise part of the curriculum of the course of study" of the school district; (4) that the use of the high school building by the student body or any other organization or person, including the defendants, for motion picture shows, dances, lyceum lectures, dramatics or vaudeville acts, games, contests, and other entertainments for which an admission price is charged and collected, and which are not part of the curriculum and course of study, are for commercial purposes; (5) that the transportation of students and others to and from such entertainments is a commercial purpose; (6) that, permitting the student body and others to hold entertainments in the high school building without requiring payment of all expenses incident to such use as for fuel, light, janitorial, and transportation service is in violation of law. In the second part of the decree the school board, the individual members thereof and their successors in office, and the school district are perpetually enjoined and restrained from (1) using or permitting the use by any one of the high school buildings or property for holding of any entertainments or recreational activities for

a commercial purpose; (2) allowing the transportation equipment to be used in connection therwith; (3) using the tax funds of the district to defray any costs of upkeep, fuel, light, water, janitorial, or transportation services for any such entertainments; (4) allowing or permitting the student body or any other organization or person to use the school building or equipment without payment to the district for the use of the school property such sum as the school board deems just, but not less than the cost of upkeep, light, fuel, janitorial, and other services; (5) use of the school building and grounds for recreational purposes or as a civic center, unless all expenses incident thereto are paid out of the tax revenues of the district after being properly budgeted or from funds received by the school district from donations, bequests, or legacies.

The trial court erred in holding that the organized student body of the North Summit High School is not a part of the educational system of the district. While not required by statute as part of the minimum educational program, Laws of Utah 1931, c. 57, p. 243, it is within the power of the board of education to authorize and maintain such an organization as one of the required educational activities and as part of the educational system of the district. This it may do pursuant to the provisions of section 4617, wherein it is empowered "to do all things needful for the maintenance, prosperity, and success of the schools, and the promotion of education." Defendants by their answer and by evidence defend and seek to justify their action on the ground that most of the entertainments and activities complained of, termed extracurricular activities, were conducted by the student body of the school, not as an ordinary business or commercial proposition, but as part of the educational program authorized by the board of education of the district with the approval of the state superintendent of public instruction and the state board of education. The evidence shows that the student body organization was authorized by the board of education of the district,

and that the constitution adopted by the student body had the sanction and approval of the board. The student body constitution provides that all students of the seventh, eighth, ninth, tenth, eleventh, and twelfth grades, paying their annual activity fee and participating in class work, and all faculty members are members of the organization. The officers are a president, vice president, secretary and treasurer, manager of athletics, manager of advertising, cheer leader, and editor of school paper. The duties of the officers are specified in the constitution. Provision is made for the giving by the student body organization of activity pins and letters to students participating in debate, music, drama, football, basket ball, and other athletic contests.

The court, in its findings of fact, found that the student body was organized by the students of the school by and with the permission of the board of education "for the government of themselves and their carrying on of student social and entertainment activities not contemplated by the school curriculum," and that the dances, motion picture shows, lyceum lectures, and musicales, games, and athletic contests about which complaint is made are conducted by the student body, and that a fee is charged for admission to such entertainments, and that no part of the income goes to the school treasury to cover the cost of heating, lighting, janitorial, and other services.

That the student body organization and proper activities thereof are part of the educational system of the district we think admits of no doubt. The scope of its activity, as indicated by the constitution, shows a purpose closely related to the school curriculum, although not required thereby, and is certainly within what is now regarded by all educators as a modern educational system. In the evidence we find a pamphlet written by the character education committee, composed of leading educators of the state, and promulgated by the state department of education with its full approval, entitled "Character Education Supplement to the Utah State Course of Study for Elementary and High Schools." This

pamphlet was sent to all the schools of the state with the sanction of the state superintendent of public instruction. Under the title "High School Community Activities" is the following:

"Among the most important factors in the moral education of youth is the community life of the school. It is in this community life that social ideals and attitudes are developed—ideals and attitudes that will continue to function in after years. The various types of student activities furnish real laboratory practice in community life."

The following activities are recommended: Student government, the assembly period, the school paper, school parties, dramatics, music, debating, and athletic contests. The objectives of these several activities are fully set forth, and show a necessary relationship to an efficient school program.

Dr. C. N. Jensen, state superintendent of public instruction, and other prominent school men were called as witnesses. Each testified that the student body organization and the activities conducted by and associated with such an organization are an essential part of a modern system of education. Dr. Jensen testified in substance that he would not approve of schools that did not engage in student activities called extracurricular; that such activities are a vital part of the educational system of the state for the purpose of attaining the objectives outlined in the curriculum; that by extracurricular activities is meant all phases of athletics, football, basket ball, track, student assemblies, dramatics, and oral expression, that is, reading and oratorical contests, visual education in the broader sense, in fact all of these things that bring education out of the realm of talking about a thing and taking it over into the realm of doing things; that the purpose of having student body organizations in schools is to develop a proper attitude with respect to citizenship, giving the students experience in self-government and to show them the responsibility that is expected of them when they go out, and that it is an aid to the school authorities in governing the students; that student

body organizations are carried on through the educational system in all high schools, and he is urging them in the junior high schools throughout the state; that, in addition to student body organizations, he is encouraging the formation of clubs, science clubs, literary clubs, hiking clubs, and the like; that the student body fee is for the purpose of giving the school authorities the power to go out and contract or lay down a program throughout the year for the adopting of the extracurricular activities they desire.

Dr. Leroy E. Coles, professor of educational activities, and now dean of the lower division of the University of Utah, testified in substance that by extracurricular activities is meant such activities as are not usual classroom activities, such as the organizing of the student body, and under their management the conducting of parties, dances, entertainments; the organization of literary clubs, of musical societies, athletic activities, debates, and operas and dramatics; that the giving of motion picture exhibits, unless given in the classroom for the purpose of elucidating some point in very close connection with instruction given, is ordinarily an extracurricular activity; that extracurricular activities are participated in or carried on to some extent in all of the schools of the state, including the University of Utah and the Agricultural College, and are a very important part of the school. Professor Francis W. Kirkham, then superintendent of the Granite District School, now general secretary of the Child's Welfare Association of America, testified in substance that there is now a greater recognition among school men of the importance of so-called extracurricular activities due to the fact that more dependence is being placed upon them in reaching those objectives which are now somewhat new, such as attitudes and ideals or habits of control, which school men recognize as significant.

Ernest A. Jacobsen, superintendent of the North Summit school district, testified that the student body organizations give pupils actual experience in self-government, and create

an interest in government, and if the drama, the opera, basket ball, and student dances and athletics were cut out, the effect upon the educational system would be to move back more than a century; that the purpose of the student body activities is not a commercial one, but is wholly educational in the sense that education includes also entertainment.

The only conclusion we can reach from the evidence in the record is that, while the student body activities are not part of the curriculum or course of study of the schools, and are regarded as extracurricular activities, yet they are essentially a part of any efficient educational system, and cannot be regarded as private in nature or independent of or disassociated from the school and its necessary educational program.

The court decisions of other states support the view that under our law the board of education may permit the use of the school buildings and grounds by the student body for its dances, lectures, shows, games, and other entertainments, and that, when it does so, even if no charge for the use of the school property is made, such is within its authority and will not be disturbed by the courts.

A recent case particularly in point on most of the questions raised here is *Merryman* v. *School Dist. No. 16,* supra. The plaintiff there, as here, was a taxpaying citizen of the district and owner of a hall which he rented for dances, social gatherings, and public meetings. The use sought to be enjoined was by the student body for games, plays, dramatic exhibitions, by the parent teachers' association for carnivals and shows, and by the Knights of Pythias Lodge for dances. The evidence shows the school board charged a rental to the Knights of Pythias Lodge, but that the school property was permitted to be used free of charge by the student body and the parent teachers' association. The question was one of the authority of the qualified electors of the district to permit such uses under a statute (Comp. St. Wyo. 1920, § 2239) which provided that the "qualified electors of

the district, when assembled, shall have power: * * * To direct the sale or other disposition to be made of any school house," etc. The holding was that the schoolhouse might lawfully be used for the purposes mentioned, and that, in the absence of a showing to the contrary, the school board was presumed to have acted within authority from the qualified electors. The opinion contains an extended review of the cases supporting the conclusion reached, which is stated as follows:

"So long as the proper maintenance and conduct of the school is not interfered with, or in any wise hampered, and so long as school district property is neither injured, defaced nor destroyed, as we view it, our law vests a generous amount of discretion in the school district electors, in regular meeting assembled, concerning what use shall be made of the district school property when it is not in actual service for formal school sessions. * * * That this is a wise and salutary arrangement we have not the slightest doubt. It is especially manifest in view of the broadening sphere of educational activities. With that discretion we must decline to interfere in the case at bar, for in our judgment the law defining the powers of school districts has not been transgressed."

To similar effect are *Brooks* v. *Elder*, 108 Neb. 761, 189 N. W. 284, where the court declined to enjoin the use of school auditorium for supervised dances, and *Cook* v. *Chamberlain*, 199 Wis. 42, 225 N. W. 141, where, under general powers to "adopt such measures as shall promote the good order and public usefulness of said schools," the court held the school authorities lawfully conducted a supply station in which books and supplies were sold to students, without profit but without cost to the school treasury. In *Woodson* v. *School Dist. No. 28*, 127 Kan. 651, 274 P. 728, use for dramatic and athletic activities was upheld; in *Commissioners of Dist. of Columbia* v. *Shannon & Luchs Const. Co.*, 57 App. D. C. 67, 17 F. (2d) 219, and *McNair* v. *School Dist.*, 87 Mont. 423, 288 P. 188, 69 A. L. R. 866, athletic field and equipment were held part of educational requirements; and in *Alexander* v. *Phillips*, 31 Ariz. 503, 254 P. 1056, 52 A. L. R. 244, authority to build schools was

held to include power to build a stadium. It has been held that the establishment and maintenance of a cafeteria by a parent teachers' association, with permission of the board, where conducted for the student body of the school for reasons which concern the welfare of the students, does not subserve a private mercantile purpose in any commercial competition with private restaurants, and is within lawful powers of the board. *Goodman* v. *School Dist. No. 1, City and County of Denver* (C. C. A.) 32 F. (2d) 586, 63 A. L. R. 92; *Bozeman* v. *Morrow* (Tex. Civ. App.) 34 S. W. (2d) 654. In *Security National Bank* v. *Bagley,* supra, it was held that a school board, under general powers, was acting within its authority in establishing a system for teaching thrift in the school by contracting for use of a copyrighted system for deposit of savings of pupils in a bank, with interest, and that a taxpayer cannot complain if the system is not a burden on the school treasury, nor could a competitive bank complain of "unfair competition." In *McClure* v. *Board of Education,* supra, where the California court had before it the "Civic Center Act," similar to our sections 4551-4554, it was held that the school board was authorized to permit, under proper supervision, dancing as a recreational activity in the schoolhouse.

Cases have been cited by respondent denying the power in school boards to permit the uses, or some of them, about which complaint is made. The power depends on statutory authority in every instance, and, where the statutes are different from ours, the cases under them are not persuasive. The first case to consider is that of *Lewis* v. *Bateman*, 26 Utah 434, 73 P. 509. This decision of this court was based on the statute then in effect authorizing school boards to permit a schoolhouse, when not occupied for school purposes, to be used for any purpose which will not interfere with the seating or other furniture. It was admitted that, in order to hold dances, the seats, which were fastened to the floor, had to be removed and piled in another part of the house. The case was decided when the court found that

the letting for a dance was in contravention of the statute. The declaration of the court that such private use was contrary to public policy was not necessary to the decision. This statute was repealed in 1919 and again enacted in slightly different language in 1923. As indicated above, other legislative enactments have, since the decision of *Lewis* v. *Bateman,* supra, greatly enlarged the discretionary powers of school boards in respect to the use of school property, and determined the public policy of the state on that subject. *Bender* v. *Streabich,* 182 Pa. 251, 37 A. 853, held schoolhouses could not be used for religious meetings or public lyceums, but, since there is no reference in the decision to the statutory powers of school authorities in Pennsylvania, the case furnishes no basis for comparison and is not helpful. In support of respondent's position, he cites and relies on the following cases: *Lincke* v. *Moline Board of Education,* 245 Ill. App. 459; *Tyre* v. *Krug,* 159 Wis. 39, 149 N. W. 718, L. R. A. 1915C, 624; *Sugar* v. *Monroe,* 108 La. 677, 32 So. 961, 59 L. R. A. 723; *Herald* v. *Board of Education,* 56 W. Va. 765, 65 S. E. 102, 31 L. R. A. (N. S.) 588; *McGilvra* v. *Seattle School Dist. No. 1,* 113 Wash. 619, 194 P. 817, 12 A. L. R. 913; *Nerlien* v. *Village of Brooten,* 94 Minn. 361, 102 N. W. 867; *Trustees of Special Tax Dist. No. 1* v. *Lewis,* 63 Fla. 691, 57 So. 614; *Moore* v. *Brinson,* 170 Ga. 680, 154 S. E. 141.

None of the cited cases are directly in point except as they hold that a public corporation, such as a school district or municipality, may exercise such powers only as are conferred by statute either by express words or necessary implication. The statutes of Utah grant large powers to its school boards.

It does not follow, however, that every activity that may be engaged in by the student body is part of the modern educational program. The student body may not do more than the board of education may authorize or aprove, or do anything that is prohibited by law. The activities referred to in the student body constitution are clearly educational

and a part of an enlarged modern educational program as outlined and approved by the school men who testified. This suit, however, would probably not have been brought had the student body confined its activities merely to those matters specified in its constitution. The evidence shows that the student body has conducted, each school year from 1924 to 1927, both inclusive, a lyceum course consisting of not more than five lectures and musical entertainments; from eight to eleven dances, two or three football contests; one or two operas, two dramas, five to eight moving picture shows, seven basket ball games, and one dance pageant. Students paying the student body fee were admitted to these entertainments without further charge, but an admission fee was collected from all other members of the public. School and class dances, basket ball and football games between the teams of the North Summit High School and other schools, dances and operas produced by the students of the school, lectures and musical entertainments, are activities so connected with the school program as to be considered part of the educational system. The student body did not stop here, but conducted a series of motion picture shows of the kind ordinarily shown in the moving picture theaters, and conducted dances which were widely advertised and open to the general public, athletic contests between teams from other counties in which no students of the North Summit High School participated, and for these entertainments charged and collected admission fees and paid no rent to the school board for the use of the building or grounds to cover the necessary expenses incident to such use. It is the use of the building for these latter purposes which causes difficulty. If these are conducted for commercial purposes, then the board of education has no power to permit the school to be used for such purposes. The crux of the matter is to determine what is meant by the phrase "commercial purposes" as used in section 4587.

The trial court by its decree determined that any extra-curricular activity or entertainment whether conducted by

the student body or other organization or person, where an admission price is charge or collected, was for a commercial purpose. It would seem that the court considered the determining factors in defining the phrase "commercial purpose" as used in the law to be: (1) That the activity was not part of the curriculum or course of study; and (2) that an admission fee. is charged and collected.

We have already concluded that extracurricular activities are a proper and necessary part of our educational system, and hence cannot be considered as carried on for commercial purposes. What is done for the student body for reasons which concern the educational welfare of the students cannot be said, in the presence of our statute and its broad provisions, to be done for commercial purposes. *Goodman* v. *School Dist. No. 1, supra.*

Is the test of commercial purpose the fact that a fee is charged or collected for admission to any game, contest, show, entertainment, or other activity? The statute makes no such test. On the contrary, the statute, section 4552, contemplates that such a fee may be lawfully charged. What, then, is a "commercial purpose?" The word "purpose" is defined in Webster's New International Dictionary as "That which one sets before himself as an object to be attained; the end or aim to be kept in view in any plan, measure, exertion, or operation; design; intention." In the same dictionary the word "commercial" is defined as "of or pertaining to commerce; mercantile; hence variously; occupied with commerce; engaged in trade." The word "commerce" is defined as "business intercourse, especially the exchange or buying and selling of commodities, and particularly the exchange of merchandise on a large scale between different places or communities; extended trade or traffic." The earlier word used was "merchandise." The definitions in the decided cases are similar to and in harmony with the definitions given in the dictionary of the words "commerce"

and "commercial." In *Plummer* v. *Northern Pac. Ry. Co.* (C. C.) 152 F. 206, 208, the court said:

"Commerce has been defined to be traffic; that is, the buying, selling, and exchanging of commodities. This comprehends more than the mere contracts by which merchandise is bought, sold, and exchanged. The actual transfer of merchandise and delivery of the manual possession thereof, and its transportation from one place to another are included."

Similar definitions are given in other cases: *State* v. *Delaware, Lackawanna & W. R. R. Co.*, 30 N. J. Law 473; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325; *United States* v. *United Steel Corp.* (D. C.) 223 F. 55. Through all these definitions runs the idea that trade and commerce require the transfer of something, either of persons or commodities or intelligence, from one place or person to another.

The owning, controlling, and leasing of theaters, producing plays, and booking contracts for the production of plays, have been held not to be commerce within the Penal Code of New York which prohibits a conspiracy to commit any act injurious to trade or commerce. *People* v. *Klaw*, 55 Misc. 72, 106 N. Y. S. 341, 354. Judge Rosalsky, who wrote the decision said: "After an exhaustive examination of the subject of what is trade and commerce, I have failed to find any decision, nor has my attention been directed to any decision, classifying theatrical amusements as articles of 'trade' and 'commerce.'"

In *American League Baseball Club of Chicago* v. *Chase*, 86 Misc. 441, 149 N. Y. S. 6, 17, it was held that "baseball is an amusement, a sport, a game that comes clearly within the civil and criminal law of the state, and it is not a commodity or an article of merchandise subject to the regulation of Congress on the theory that it is interstate commerce," and hence not subject to the Sherman Anti-Trust Act (15 U. S. C. A. §§ 1-7, 15 note) to protect trade and commerce against unlawful restraints and monopolies. In *National League* v. *Federal Baseball Club*, 50 App. D. C. 165,

269 F. 681, 685, an action for damages under the Sherman Anti-Trust Act, it was held that the business of giving exhibitions of baseball games for profit is not trade or commerce within the meaning of the act. The following is quoted from this decision:

"Nothing is transferred in the process to those who patronize it. The exertions of skill and agility which they witness may excite in them pleasurable emotions, just as might a view of a beautiful picture or a masterly performance of some drama; but the game effects no exchange of things according to the meaning of 'trade and commerce' as defined above. * * *

"Suppose a law firm in the city of Washington sends its members to points in different states to try lawsuits; they would travel, and probably carry briefs and records, in interstate commerce. Could it be correctly said that the firm, in the trial of the lawsuits, was engaged in trade and commerce? Or, take the case of a lecture bureau, which employs persons to deliver lectures before Chautauqua gatherings at points in different states. It would be necessary for the lecturers to travel in interstate commerce, in order that they might fulfill their engagements; but would it not be an unreasonable stretch of the ordinary meaning of the words to say that the bureau was engaged in trade or commerce? If a game of baseball, before a concourse of people who pay for the privilege of witnessing it, is trade or commerce, then the college teams, who play football where an admission fee is charged, engage in an act of trade or commerce. But the act is not trade or commerce; it is sport. The fact that the appellants produce baseball games as a source of profit, large or small, cannot change the character of the games. They are still sport, not trade.

"It has been ruled that the production of grand opera at points in different states according to a prearranged schedule involves 'none of the elements of trade or commerce as commonly understood.' *Metropolitan Opera Co.* v. *Hammerstein,* 162 App. Div. 695, 147 N. Y. S. 535. 'Such a transaction,' said the court, 'is as far removed as possible from the commonly accepted meaning of trade and commerce.' In another case it was held that the skill of theatrical players which attracts the public 'is not sold; it is merely exhibited for hire;' and the fact that the producing corporation 'must buy scenery and stage appliances and furniture, which it may afterwards sell again, is of no importance' in determining whether or not the corporation was engaged in trade or commerce. *In re Oriental Society,* Bankrupt (D. C.) 104 F. 975. As supporting the same principle, see *People*

v. *Klaw* [55 Misc. 72], 106 N. Y. S. 341; *American Baseball Club of Chicago* v. *Chase*, 86 Misc. 441, 149 N. Y. S. 6; *Minnesota* v. *Duluth Board of Trade*, 107 Minn. 506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260; *Rohlf* v. *Kasemeier*, 140 Iowa 182, 118 N. W. 276, 23 L. R. A. (N. S.) 1284 [132 Am. St. Rep. 261, 17 Ann. Cas. 750]; and *State* v. *Frank*, 114 Ark. 47, 169 S. W. 333, 52 L. R. A. (N. S.) 1149, Ann. Cas. 1916D, 983. In the American Baseball Club Case the precise question we are considering was passed upon in a carefully prepared opinion, and it was held that the production of exhibitions of baseball did not constitute trade or commerce. The National Agreement, the rules and regulations adopted pursuant to it, and the players' contracts, complained of in this suit, were all considered by the court in reaching its conclusion."

We have found no decision and none has been cited in the briefs which give a meaning to the words "commerce" and "commercial" broad enough to include the business of operating motion picture shows, dramatic productions, athletic games, or dances. The exhibition of motion pictures may be a business enterprise when conducted for profit, *Mutual Film Corp.* v. *Ohio Industrial Comm.*, 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552. Ann. Cas. 1916C, 296, but it does not follow that it is commercial. There are, however, some decisions which assume, without deciding, that such activities may be private business enterprises with commercial aspects when conducted for profit. *State* v. *City of Hiawatha*, 127 Kan. 183, 272 P. 113; *Young* v. *Board of Trustees*, 90 Mont. 576, 4 P. (2d) 725, 728. The court in the last-mentioned case held it to be within the power of a board of trustees of a school district to permit the use, under general statutory powers, of a high school building for dances not connected with school activities, but suggested that "the business or commercial aspect of the power granted the board, here presented, might well be urged before a legislative assembly having such an act under consideration, but cannot be considered by this court in order to defeat the will of the Legislature." On the other hand, courts have held that the sale of school supplies and maintenance of a cafeteria do not subserve a private mercantile purpose in

competition with private restaurants where conducted for the students for reasons which concern their welfare. *Bozeman* v. *Morrow* (Tex. Civ. App.) 34 S. W. (2d) 654.

We must conclude that, while the conducting of motion picture shows, dances, and other entertainments, where an admission fee is charged, may have some business aspect, yet, in view of the wording of our statute, we cannot say that the Legislature intended by the word "commercial" to exclude all games, dances, baseball, football, basket ball, debates, lectures, or musical entertainments where a charge is made for admission to such entertainments. Entertainments of this nature cannot, in the presence of the well-known definition of the word, be said to be commercial, because there is no merchandise or commodity exchanged, bought, or sold. Commerce relates to the buying, selling, exchanging, and transporting of commodities or articles of commerce or the transporting of persons. The school authorities were not engaged in ordinary business transactions, but permitted student body activities for the purpose of training the students in business management and self-government. Where an admission fee has been charged, the profits, if any were obtained, have been uniformly and exclusively used, not for the enrichment of any person or group of persons, but for the purchase of accessories and equipment for use in the schools. By the provisions of Laws of Utah 1923, c. 100, school boards are given express powers to equip and maintain playgrounds, athletic fields, and other recreational facilities, and to conduct plays, dramatics, moving picture shows, and other entertaining activities. The element of a charge of an admission fee cannot be regarded as a determining factor as to whether a particular activity is commercial or not. Even professional baseball conducted for profit has been held as we have indicated to be not a commercial activity, and by our statute, section 4552, the Legislature recognized that the school authorities may provide for or allow an admission charge to be made for entertainments held under its supervision.

The buying, selling, and exchanging of commodities or transporting of commodities or persons is such a commercial pursuit or purpose as is prohibited by statute. School property may not be used for such purposes. There are, however, exceptions by statute to the general prohibition. Section 4617 authorizes boards of education to sell text-books and supplies to students at cost, and section 1 of chapter 92, Laws of Utah 1919, as amended by chapter 107, Laws of Utah 1921, as amended by chapter 47, Laws of Utah 1929, and also by section 1, chapter 57, Laws of Utah 1931, authorizes the furnishing of free transportation to students living more than 2½ miles from school.

By another provision in the decree, the board of education may allow student body activities to be conducted by the student body where it pays for such use of the building a sum sufficient to defray expenses of fuel, light, janitorial, and and other services. It would follow that this cannot be done under the decree if any charge is made for admission even by or through the student body fees, since these fees are collected in advance for admissions to lectures, dances, and other entertainments, and the student body would have no way of reimbursing itself for the expense of the entertainment; that is, the cost of music, rent of hall, fee of lecturer, rental of the film, etc. The enforcement of this decree would exclude nearly every student body activity. The only recreational or entertainment activities permitted would be those which the board itself might conduct without an admission charge where it pays all expenses incident thereto out of its tax revenues or from funds obtained by it from legacies, donations, or bequests made specifically for recreational purposes under the provisions of section 7, chapter 100, Laws of Utah 1923. We think the statutes cannot be so narrowly construed and applied.

While it is within the discretion of the board of education to permit the giving of picture shows and dances, of the ordinary competitive kind, in the schoolhouse, yet the board

in the exercise of a wise discretion ought not to use school property for such entertainments where the community is adequately served in this respect by private enterprise. The discretion, however, to determine whether or not a school building will be used for such purpose is vested in the board of education and not in the courts. There are remedies available to any citizens of a district who believe the board of education has acted unwisely or will so act in the future. One is by petition to the board, and the other by the election of new members. The exercise of discretion within legal limits will not be interfered with by the courts except for compelling legal or equitable reasons where the board has clearly abused the discretion vested in it.

The decree entered herein enjoins the defendants from allowing or permitting the transportation equipment of said school district to be used to transport to and from games and entertainments the students of the school and others free of charge. The finding of the court is as follows:

"That said defendants have allowed and are allowing and permitting the school trucks, owned and used by said school district for transporting students to and from school, to be used for transporting students and their parents and patrons to and from said entertainments, without charge, the expense incident thereto being borne by said school district from funds collected by it by taxation; thereby adding to the expenses of said school district, and the burden of the taxpayers of said school district, and plaintiff in particular, for the purposes not a part of the curriculum of said school."

The evidence is uncontradicted that not all the cost of such transportation has been paid by the school district but only the cost of gas, oil, and repairs. The student body has usually paid the wages of drivers of trucks. The decree very properly enjoins the use of school trucks, at the expense of the school treasury, for transporting students and others to and from these entertainments. As already indicated, the furnishing of free transportation to students living 2½ or more miles from school is au-

thorized by statute, and is justified by the provisions of the law providing for the free school system, and making it compulsory for children between 6 and 18 years of age to attend the public schools. The provision for free transportation places all children in a consolidated district on an approximate equality, and such equality should be maintained as near as possible where compulsory attendance is required. Let it be assumed that the athletic and other contests, games and social entertainments, lectures and dramas have a proper place in the educational system, yet the question remains whether the board of education has authority to furnish transportation to students and patrons to and from the schoolhouse, at the expense of the district school funds, for the purpose of attending such activities. The language of the statute is "transportation to and from school." Attendance at school is compulsory. But there is no provision of law authorizing free transportation to students attending activities or entertainments where attendance is not compulsory. The expenditure of school funds for this purpose was properly enjoined. *Schmidt* v. *Blair,* 203 Iowa 1016, 213 N. W. 593. There is testimony to the effect that students playing in the school band and taking part in dramatic performances and athletic contests are required by the school authorities to attend the functions in which they personally participate. The other students may attend such performances at their option, and, when they do attend, it is merely as spectators, and not because their attendance is required. The decree should not enjoin the furnishing of free transportation to students whose attendance is required after school hours at school activities. It of course follows that the board may not, at any expense to the district, or by use of school property, furnish free transportation to the patrons of entertainments, games, or other activities.

The statement in the decree that the board of education cannot delegate its powers to the student body is undoubtedly an accurate statement of the law but we do not find any evidence in the record that the board has attempted to

delegate its governmental powers or that the student body has attempted to exercise any of the powers vested in the district board of education.

The judgment and decree is reversed and set aside, and the cause remanded to the district court of Summit county, with directions to make findings of fact, conclusions of law, and decree in conformity with this opinion. No costs will be awarded either party on this appeal.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.